## EV. LUTHERAN GOOD SAMARITAN SOCIETY, doing business as EUGENE GOOD SAMARITAN CENTER *v.* DEPARTMENT OF REVENUE

Donald D. Diment, Jr., Luvaas, Cobb, Richards & Fraser, Eugene, and Eugene T. Hackler and Robert Lindholm, Hackler, Anderson, Londerholm, Speer & Vader, Olathe, Kansas, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered February 10, 1972.

CARLISLE B. ROBERTS, Judge.

The plaintiff has appealed from the Department of Revenue's Order No. VL 71-355 which affirmed the Lane County Assessor's denial of the plaintiff's tax exemption for the tax year 1970-1971 on certain real and personal property located in Lane County. The plaintiff seeks to reverse the order and obtain a de-

termination that the subject property was exempt under the provisions of ORS 307.130 as property owned by an incorporated benevolent, charitable institution, actually and exclusively occupied or used in the benevolent and charitable work carried on by the plaintiff.

The plaintiff, the Ev. Lutheran Good Samaritan Society, is a nonprofit corporation incorporated in the state of North Dakota and authorized to engage in activity in Oregon pursuant to ORS chapter 61. It was organized in 1922 to handle a surplus of funds contributed by a Lutheran Church congregation to help a crippled boy. Its original purpose was to provide "Christian homes for epileptics, cripples and other defectives." The purposes have been enlarged in subsequent years to include nursing homes, hospitals and convalescent hospitals, homes for the aged, retirement homes, homes for troubled boys and orphans and homes for mentally retarded adults. In 1970, it operated institutions in 142 locations, in 16 central and western states. Approximately 70 percent of these institutions were nursing homes.

The real property here involved is a combined nursing home and convalescent hospital, located on a six-acre tract at 3500 Hilyard Street, Eugene, Oregon. The building was built and occupied in 1959 by the Severson Memorial Home Association, a Lutheran related organization which found itself in financial difficulties in 1967 and arranged for the plaintiff to take over the facility on the payment of arrears in the amount of $35,174.82 on mortgage payments and indebtedness to local creditors in the approximate amount of $75,000. The net worth of the nursing home, at that time, was computed at $360,000. The corporation

has continued to operate the property as a licensed convalescent hospital and nursing home under the name of the Eugene Good Samaritan Center. Although wholly owned by the corporation, the Eugene facility has been largely managed and its records kept on a segregated basis, although closely supervised by the corporation.

The Eugene Good Samaritan Center has been operated at a deficit each year since Good Samaritan took it over. In 1967 the deficit was $4,349, in 1968 it was $53,942, in 1969 it was $42,088, and in 1970 it was $62,293. These losses were in part due to rendering services beyond income. Because of these financial losses, the Good Samaritan Society has subsidized or underwritten the operation of the Eugene Center each year, making advances through 1971 in the total of $195,932.50.

The Eugene Good Samaritan Center is a medical-type facility and is not a retirement home. The court recognizes that care of the person can vary in degree over a wide range, including hot meals sent in to a person's home to insure proper nutrition, intermediate or chronic custodial care on a continuous basis (in nursing homes), intense care in hospitals for limited periods, prolonged remedial or terminal care in convalescent hospitals and nursing homes, and the like. These can all be differentiated from retirement homes for the ambulatory aging, such as were considered in *Methodist Homes, Inc. v. Tax Com.,* 226 Or 298, 360 P2d 293 (1961), and *Friendsview Manor v. Tax Com.,* 247 Or 94, 420 P2d 77, 427 P2d 417 (1967).

In *Methodist Homes, Inc. v. Tax Com., supra,* the court pointed out that taxation is the rule and exemption from taxation is the exception and statutes such as ORS 307.130 will be construed most strongly against

those petitioning for the exemption. The court then reviewed the main "hospital" cases and pointed out that the following elements received chief consideration in determining whether or not a given facility was or was not a charity: Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed? Whether patients or patrons receive the same treatment irrespective of their ability to pay? Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed? Whether charges are made to all patients and, if made, are lesser charges made to the poor or are any charges made to the indigent? Whether there is a charitable trust fund created by benevolent and charitably minded persons for the needy for donations made for the use of such persons? Whether the institution operates without profit or private advantages to its founders and the officials in charge? Whether or not the articles and bylaws of the corporation make provision for the disposition of surplus assets on dissolution to prevent the enrichment of the incorporators, stockholders or private individuals?

While the Supreme Court decision goes on to say (page 310) that it does not require all the foregoing factors to be present before a given institution can be declared one of charitable or of noncharitable pursuits, this court finds the plaintiff to be a charitable institution with respect to each of the criteria set out. But this does not decide the present case. It will be noted that, on the same page, the Supreme Court adds:

"* * * Nor do we say that the list includes all items which may assist in a conclusion respecting the charitable or noncharitable status of a given corporation. The itemization represents only those particulars which have been in the past employed

by this court in discovering if a given hospital is or is not in fact eleemosynary."

The Department of Revenue, in its Order No. VL 71-355, concluded: "It is the opinion of the Director that the Petitioner is in competition with other similar homes operating for profit and that the subject property is not actually and exclusively used in charitable work as required by ORS 307.130(1) and that therefore the petition should be denied." This conclusion apparently stems from two aspects of the case, as follows:

First, the financial report of the corporation for the year ending December 31, 1970, covering 137 facilities, showed a total income of something over $28,000,000 and a net income, after depreciation, of slightly more than $1,000,000. (This consolidated report included the accounting of the Eugene Good Samaritan Center.) The second aspect relates to whether charges are made to all patients and, if made, are lesser charges made to the poor or are any charges made to the indigent.

The facts show that the Eugene Good Samaritan Center has a regular scale of charges which are imposed upon any patient able to pay his way (Plaintiff's Exhibit 49). A substantial percentage of the patients (ranging from 25 to 33 percent of the average population) have been welfare patients, taken by the nursing home under contract with the State Public Welfare Division. While the total cost per patient per day in 1971 has proved to be $12.68, welfare payments during that period did not exceed $10.33 per patient per day except in instances where "heavier care" was required, when the amount paid would be $11.01. Nevertheless, the facility was being paid for its services and

the evidence reveals that virtually every patient who was not able to pay his way was eligible for the welfare assistance. (The testimony indicated that no person was denied admission to the nursing home because of inability to pay but, upon being received, steps were taken to obtain the welfare assistance to which he was entitled under the law.)

These facts have led the Department of Revenue to conclude that the nonprofit corporation does enjoy profits and that no "charity," within the concept of "alms giving," is here involved.

█ In the present instance, the court has no difficulty in finding for the plaintiff that its net income of $1,000,000 does not derogate from its nonprofit status; in a very large operation, this amount, which includes contributions and some taxable income, merely reflects that "financial sagacity" approved in *Gregory v. Salem General Hospital,* 175 Or 464, 469-470, 153 P2d 837 (1944). ("* * * It is true that charity is not administered in the defendant's hospital with a free hand; but charity does not lose its character as such when it becomes sagacious. * * *") No profit inures to any member of the corporation.

The second point, the care of welfare patients for pay as constituting "charity," is pertinent for today and has not been directly answered in any case brought to the court's attention or discovered by it. While it is true that plaintiff is committed to accept patients irrespective of welfare payments and to retain every patient whose funds have been exhausted, it is urged that good words are not enough; acts are all important. *Hamilton v. Corvallis Hosp. Ass'n,* 146 Or 168, 30 P2d 9 (1934); *Benton Co. v. Allen et al.,* 170 Or 481, 133 P2d 991 (1943).

The uncontradicted testimony of the Eugene facility's long-time accountant showed that while welfare aid helps to meet the facility's overhead and that while Ev. Lutheran Good Samaritan welcomes all welfare patients, it would be impossible to operate the nursing home if it had nothing but welfare patients, on the basis of the payments made by the State of Oregon (Tr. 36). The gap between welfare payments and the established charges of the Eugene facility (on a scale designed not for profit but for the maintenance of a viable institution) for 1969 was $33,467.30; for 1970, $35,651.43; and for 1971, January to October, inclusive, $33,208.37.

Hospitals (with which the court equates nursing homes engaged in the services offered by the plaintiff herein) have long been accorded an unusual consideration (unlike most exempt institutions) in that the entity is permitted to charge its patients reasonable fees and still be regarded as charitable. As stated in Zollmann, *American Law of Charities,* 154, § 219 (1924):

"* * * It is neither usual nor desirable to confine the administration of a hospital exclusively to the indigent. [*Powers v. Massachusetts Homeopathic Hospital,* 109 Fed. 294, 295, 47 C.C.A. 122, 65 L.R.A. 372 (affirming 101 Fed. 896) (1901).] An institution which is in its nature a public charity does not lose such character though an income is received from its beneficiaries. [*Episcopal Academy v. Philadelphia,* 150 Pa. 565, 574, 25 Atl. 55 (1892).] It is none the less a charity because it is discriminating. [Citations.] 'Furnishing board, lodging and nursing to needy persons is among the most familiar and useful of charities, and that which constitutes such an institution a charity is that it does not furnish these things for profit.' [*Gooch v. Association for Relief of Aged Indigent Females,* 109 Mass 558, 567 (1872).] An institution

from which the rich are not turned away because of their wealth, nor the poor because of their poverty is, therefore, a public charity, [citations] so long as payments received from patients or other beneficiaries are devoted to the general purposes of the charity and not to the private benefit of individuals or corporations. [Citations.] 'By this operation, the funds of the institution are not absorbed, but augmented; the charitable object of the asylum is not diminished, but promoted; and the nature of it is not changed but pursued.' *[American Asylum v. Phoenix Bank, 4 Conn. 172, 178, 10 Am. Dec. 112 (1822).]* \* \* \*"

The Oregon cases reflect the foregoing conclusions. For example, in *Benton Co. v. Allen et al., supra,* at 489, the court comments that the only justification for the exemption from taxation of property which has been devoted to charitable purposes is that the operation of a public charity tends to minimize the expenses of government and in this connection some courts have defined charity narrowly. The court goes on (page 490):

"\* \* \* The exigencies of frontier life, however, no doubt caused western courts to take a broader and more generous view. Particularly was this true in relation to the establishment of hospitals, which, under frontier conditions, were greatly needed, and public policy encouraged their establishment by exempting their property from taxation where they could, even in a slight degree, qualify as charitable institutions. It is perhaps impossible to establish a definite yardstick; each case must be considered upon its own facts. \* \* \*"

As stated in *Methodist Book Concern v. St. Tax Com'n,* 186 Or 585, 596-597, 208 P2d 319 (1949):

"\* \* \* It requires no citation of authorities to support the statement that this state bears a heavy burden of responsibility for the care of the blind,

the old and the needy, and has a vital interest in the proper administration of public charities and of charitable corporations operating in the state."

The exigencies of frontier life have been replaced by the exigencies confronting the modern social state, so that today governmental welfare activities are considered necessary to fill a need which at one time was deemed to be sufficiently met through citizens' contributions to private charities. Where once a charitable hospital or nursing home could subsist by virtue of charges to paying patients plus contributions, today's recognized needs could not be met without the use of statutory welfare aid.

The plaintiff should and does contribute to the state's welfare program without profit to itself. (Welfare pays a higher fee to proprietary nursing homes, in recognition of their private capital investment (Tr 227-228).)

Among the principles enunciated in the case of *Ore. Physicians' Serv. v. State Tax Com.*, 220 Or 487, 349 P2d 831 (1960), Mr. Justice Rossman stated (page 506):

"* * * A rule of thumb capable of serving the purposes of ORS 317.080 (6) in cases of this kind would very likely envision that in order for the activities of a taxpayer to entitle him to exemption as 'social welfare' work they must be calculated to benefit some other group than the one which supplies the money and directs its disposition. The group benefited may be large or small, definite or indefinite in number, but in the benefaction some motive of altruism must clearly shine forth."

■ In the present case, the Ev. Lutheran Good Samaritan Society, a nonprofit corporation, is collecting moneys from paying patients, contributions from

third parties and partial payments of costs through welfare funds from governmental agencies in order to take care of a class of patients dependent upon charity. The plaintiff cannot deny admission to welfare patients whose needs are within the plaintiff's program and for whom it has room. (Its publicity materials make clear that it expects to take such cases.) (Plaintiff's Exhibit 48.) A charitable corporation, such as the plaintiff, holding itself out as a haven for the destitute who need nursing care, refusing admission to none for whom there is room, will not lose its charitable status because it serves welfare patients and no other nonpaying patients apply. With all the other criteria of a charitable corporation being fully met, it is concluded that the corporation's status as a charitable institution in 1970 is clearly established.

The court is not blind to the danger of misuse of the statutory exemption by an agency less altruistic than the plaintiff. The Supreme Court has found situations in which the law has been abused. Constant scrutiny by the administrative authority is justified. It will call upon the Attorney General for any indicated action. See *Waller v. Lane County,* 155 Or 160, 171-172, 63 P2d 214 (1936):

"One obvious reason for exemption of the property of charitable corporations from taxation as distinguished from the property of individuals is that such a corporation is subject to the supervision of the courts at the instance of the Attorney General (11 C.J., Charities, sec. 84, p. 366) whenever it seeks to devote its property to other than the purposes for which it was organized, while an individual is not subject to such supervision, but may exercise plenary control over his property and without notice or explanation make any change or changes he may wish. A corporation of the char-

acter here discussed cannot thus alter its purpose without at least amending its articles of incorporation and thereby destroying its right to the statutory exemption."

The evidence in the present case does not substantiate the contention that, through a tax exemption, the state is subsidizing the corporation to the detriment of private proprietary nursing homes in Lane County.

The defendant's order is set aside and the Director of Assessment and Taxation of Lane County is directed to restore to the plaintiff its exempt status on the assessment and tax rolls in Lane County for the tax year 1970-1971.