No. 32          August 30, 2013          245

IN THE OREGON TAX COURT
REGULAR DIVISION

HAZELDEN FOUNDATION,
*Plaintiff,*

*v.*

YAMHILL COUNTY ASSESSOR
and Department of Revenue,
*Defendants.*

(TC 5030)

Plaintiff (taxpayer) appealed from a decision of Defendant Yamhill County Assessor (the county) as to the tax exemption status of its property in Yamhill County. Taxpayer argued that its property was exempt due to the fact it was used in taxpayer's activities, which it considered to be charitable under ORS 307.130. The county asserted that taxpayer did not meet the criteria of a charitable institution under the requirements of the statute, specifically because taxpayer's work did not incorporate the required component of "gift or giving" recognized in the case law of Oregon courts concerning exemption for property owned by charitable institutions. Following trial the court found that while taxpayer's activities met some of the factors of a qualifying charitable institution, other crucial factors, particularly taxpayer's tiered payment structure and taxpayer's decision to not accept payment from government insurance programs, meant that taxpayer's doors could not be considered open to rich and poor alike, therefore taxpayer could not be considered a charitable institution pursuant to the requirements of ORS 307.130.

Trial was held June 25, 2012, in the courtroom of the Oregon Tax Court, Salem.

Dan Eller, Schwabe Williamson & Wyatt PC, Portland, argued the cause for Plaintiff (taxpayer).

Darren Weirnick, Assistant Attorney General, Department of Justice, Salem, and Christian F. Boenisch, Yamhill County Counsel, McMinnville, argued the cause for Defendants Department of Revenue (the department) and Yamhill County Assessor (the county).

Decision for Defendants rendered August 30, 2013.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This case comes before the court for decision following a trial in the Regular Division. Plaintiff (taxpayer)

contends that certain real property and certain personal property owned by taxpayer and located in Yamhill County was exempt under ORS 307.130 during the 2010-11 tax year.[1] Taxpayer argues that it was, and is, a charitable institution and the property in question was actually and exclusively used in the charitable work of taxpayer. Defendants Yamhill County Assessor and the Department of Revenue (collectively referred to in this opinion as "the county") concede that taxpayer met some of the characteristics of a charitable institution, but that its activities lacked the required element of "gift or giving" found in Oregon case law concerning ORS 307.130. The county also contends that taxpayer has failed to carry the burden of proving by a preponderance of the evidence that some of the real property at issue in this case was actually and exclusively used in the charitable work of taxpayer during the tax year at issue. The tax year at issue is 2010-11.

This opinion should be read in context with this court's decision in *Serenity Lane, Inc. v. Lane County Assessor*, 21 OTR 229 (2013).

## II.   FACTS

Taxpayer is an IRC section 501(c)(3) nonprofit corporation organized under the laws of the state of Minnesota.[2] For many years a wholly-owned subsidiary of taxpayer operated an addiction treatment facility in the city of Newberg in Yamhill County. In 2010, taxpayer merged with its subsidiary and assumed direct ownership of the treatment facility.

Taxpayer's bylaws state that it is organized to provide "high quality, affordable rehabilitation, education, prevention and professional services and publications in chemical dependency and related disorders." Taxpayer operates the facility as part of that mission. Taxpayer is known for serving individuals who are employed as professionals, such as doctors and lawyers. During the 2010-11 tax year, about 50 percent of taxpayer's patients were professionals; the remaining 50 percent came from non-professional backgrounds.

---

[1]  All references to the Oregon Revised Statutes (ORS) are to the 2009 edition.

[2]  All references to the Internal Revenue Code (IRC) are to the 2008 edition.

Taxpayer's primary focus is on inpatient residential treatment of individuals recovering from substance addiction. Taxpayer also has a publishing subsidiary and a graduate school that offers a master's degree in addiction counseling, though it is not clear from the record to what extent the operations of those entities interacted with the operations of taxpayer's treatment facility during the tax year at issue.

Taxpayer maintains in its briefing that it charges the market rate for the treatment that it provides. The record indicates that this can be a very substantial sum: stipulated exhibits suggest that $27,000 is representative of what taxpayer would charge an average patient for 28-day residential treatment. Taxpayer has a "patient aid" program in place to assist patients who do not have the resources to pay the full price of treatment. Taxpayer's patient aid program has two primary components. First, taxpayer provides need-based discounts on the price of treatment to help calibrate the amount taxpayer charges any given patient to the financial resources available to the patient. This calibration works on the basis of 10 "tiers," with each tier representing an additional 10 percent discount on the nominal price of treatment. The tiers correspond with a scale of point scores on a worksheet that is used by taxpayer's employees to evaluate the financial resources available to a given individual. This worksheet includes factors such as household income, number of dependents, net worth, and debt-to-income ratio. In each category, more points are allocated to those whose circumstances suggest a greater need for assistance. The higher an individual's overall score, the greater the discount on treatment offered to that individual. In its response to a request for admissions from the county, taxpayer stated that it normally caps the discount offered at 60 percent off its normal rates but approves additional discounts—in some instances up to 100 percent—on a case-by-case basis. The record does not contain detailed information regarding the criteria used in evaluating patients that would require a greater than 60 percent discount to afford treatment.

In addition, during the tax years at issue taxpayer accepted a limited number of patients that had been referred to taxpayer by the Yamhill County Department of Health

and Human Services (Yamhill County HHS) free of charge. Taxpayer formalized this arrangement with Yamhill County HHS in September of 2010 by agreeing to treat one patient from Yamhill County's chemical dependency program per calendar quarter (four per calendar year). In actual practice taxpayer treated one such patient in 2009, three such patients in 2010, and five in 2011. As was mentioned above, taxpayer accepted other patients free of charge during the tax years at issue in addition to those referred by Yamhill County HHS. However, the Yamhill County HHS patients made up the large majority of the patients in either residential or extended treatment that were given free care by taxpayer.[3]

During the tax years at issue taxpayer did not admit any patients for whom federal or state government insurance was used to pay for service in whole or in part.

On or about April 1, 2010, taxpayer submitted to the county five separate applications for exemption from property tax for the 2010-11 tax year. The applications covered real property accounts 33207, 33216, 33742, and 33840, and personal property account number 480018. The applications specified that taxpayer was seeking exemption under ORS 307.130. There followed an exchange of letters between taxpayer and the county as the county sought to determine whether taxpayer's operations were charitable. Ultimately, the county decided that taxpayer was not a charitable institution and denied taxpayer's application for exemption. Taxpayer appealed the decision of the county to the Magistrate Division of the Oregon Tax Court. This matter was then specially designated to the Regular Division of the court.

## III.  ISSUE

The issue in this case is whether the facility is exempt from ad valorem property tax under ORS 307.130(2).

---

[3] Documents provided by the parties appear to show that the patient referred by Yamhill County HHS was the only patient to receive free inpatient residential or extended treatment in 2009, that two non-HHS-referred patients received free extended treatment in 2010, and that one non-HHS-referred patient received free extended treatment and one received residential treatment in 2011.

# IV.   ANALYSIS

ORS 307.130(2) reads, in pertinent part:

"[T]he following property owned or being purchased by * * * incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a)   Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

Taxpayer argues that it is an incorporated charitable institution, as that term is used in the statute, and that the five property tax accounts comprising the facility are actually and exclusively used in the charitable work carried on by taxpayer—specifically, providing treatment to those suffering from the disease of substance addiction. The county does not appear to dispute that taxpayer has some of the salient features of a charitable institution, but argues that taxpayer's work does not incorporate the required component of "gift or giving" recognized in the case law of this court and of the Supreme Court concerning exemption for property owned by charitable institutions.

The county also argues that taxpayer has not met the burden of proving by a preponderance of the evidence that some of the parcels at issue in this case are exclusively used or occupied by taxpayer.

A charitable institution, for purposes of ORS 307.130, must have the following three features:

(1)   Charity as the organization's "primary, if not sole, object";

(2)   The organization's operations must serve the charitable mission of the organization;

(3)   The presence of an element of "gift or giving" in the activities of the organization.

*SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 89, 817 P2d 1292 (1991). In its briefing the county does not dispute, and in some places implicitly concedes, that taxpayer has the first two required features. However, the county

disputes that taxpayer's activities meet the "gift or giving" requirement.

Taxpayer approaches the question of "gift or giving" from two different perspectives, derived from decisions of this court and of the Supreme Court. One of taxpayer's perspectives can be styled a "quantitative" approach; the other might be styled a "qualitative" approach. Taxpayer argues that it satisfied the "gift or giving" requirement under both approaches.

## A.    *Taxpayer's Quantitative Approach*

Taxpayer derives its quantitative approach from the Supreme Court's opinion in *YMCA v. Dept. of Rev.*, 308 Or 644, 784 P2d 1086 (1989) (*YMCA II*). In that case, the Supreme Court found that there was a lack of "gift or giving" involved in the operations of two fitness centers owned by the YMCA where the "scholarship giving" provided by the YMCA—essentially a need-based discount on the cost of YMCA memberships—amounted to "less than four percent" of the YMCA's total annual revenue. *Id.* at 653-654. Taxpayer argues that it meets the "gift or giving" requirement because the amounts it gives in patient aid substantially exceeded four percent—amounting to about seven percent of annual revenues during the two calendar years included in the 2010-11 tax year.

Taxpayer further points out that the *YMCA II* court also justified its decision in that case on the ground that only eight percent of the members at the relevant YMCA facilities had benefitted from the discount policy, whereas between 25-30 percent of taxpayer's patients received some reduction of charges through taxpayer's patient aid program during the 2010-11 tax year.

In other words, taxpayer takes the Supreme Court's use of the phrases "less than four percent" and "less than eight percent" as establishing "floors." Under taxpayer's quantitative approach, taxpayer would satisfy the "gift or giving" requirement because the revenues devoted to its patient aid program and the distribution of that aid among taxpayer's patients exceeded both of the "floors" taxpayer

asserts that the *YMCA II* court established during the tax year at issue.

This court is of the opinion that taxpayer's quantitative approach asks the phrasing of the Supreme Court to do more work than the context of those statements justifies. *YMCA II* does not state whether four percent and eight percent are floors, or deep in the basement (to extend the metaphor). Nothing in the Supreme Court's decision compels this court to rule that the "gift or giving" requirement is met simply because taxpayer's patient aid exceeds four percent of annual revenues and more than eight percent of taxpayer's patients receive such aid.

B.   *Taxpayer's Qualitative Approach*

Taxpayer's qualitative approach is more in keeping with the cases of this court and of the Supreme Court on the subject of exemption for charitable institutions. Under taxpayer's qualitative approach, taxpayer argues that it satisfies the "gift or giving" requirement because it satisfies qualitative criteria for a charitable institution that have been adopted by the Supreme Court and used by this court in past cases:

> "(1)   Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
>
> "(2)   Whether patients or patrons receive the same treatment irrespective of their ability to pay;
>
> "(3)   Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed;
>
> "(4)   Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent."

*SW Oregon Public Def. Services*, 312 Or at 82, (quoting Oregon Administrative Rule (OAR) 150-307.130-A(4)(d)(C)). In keeping with these prior cases, not all of the factors listed above have to be present for a given organization to meet the "gift or giving" requirement, nor are these the only factors that a court could rely on to determine that sufficient "gift or giving" is present in the activities of a given organization.

*Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 310, 360 P2d 293 (1961). However, these factors have been specifically identified as probative of the presence or absence of "gift or giving."

The court observes at the outset that the county does not allege any discrimination on the basis of race, skin color, or religious identification on the part of taxpayer. The court therefore considers that part of the third "gift or giving" factor satisfied. However, whether taxpayer's "doors are open to rich and poor alike" will be established at length in the following analysis.

With regard to the first factor, taxpayer's Assistant Controller testified at trial that the revenues taxpayer derives from the facility are reinvested into the operations of taxpayer. The county appears to argue that this is insufficient to satisfy the first "gift or giving" factor, because revenues from the facility are used to "subsidize" taxpayer's activities in other jurisdictions, rather than simply being reinvested in the facility itself.

The county's argument is not well taken. The court does not understand the first "gift or giving" factor as requiring that receipts derived from one operation by a purportedly charitable institution remain forever segregated and used only in maintaining or expanding that one operation. Nor does the court read the first factor to require that such receipts not be used to subsidize other activities of the institution, at least as long as those activities contribute to the charitable goal of the institution and are not undertaken for private profit. The first "gift or giving" factor deals with the revenues of a purportedly charitable institution at the level of the institution; hence the word "institution" in the material quoted above from the Supreme Court's decision in *SW Oregon Public Def. Services*. The point of the factor is that revenues received by an institution organized for a charitable purpose must be used in furtherance of the charitable purpose of the institution rather than, for instance, the enrichment of the private individuals that control the institution. *Cf. Methodist Homes, Inc.*, 226 Or at 315-16. As long as no such ulterior use of revenues is present, this first factor is met regardless of whether a purportedly charitable

institution's component parts are self-sustaining or must be supported by excess revenues of other parts of the institution's overall operation. The county has not alleged any such ulterior use and so, in light of the testimony of taxpayer's Assistant Controller, this factor leans in taxpayer's favor.

Taxpayer argues that it meets the second factor because it provides the same treatment to its patients regardless of their ability to pay. Based on the testimony at trial, the court understands that what taxpayer means by this is that there is no differentiation in the treatment that is given to taxpayer's patients based on their ability to pay *once they are actually admitted to the facility*. The court agrees that equal treatment of patients irrespective of ability to pay *after the decision to admit the patient has been made* is an indicator, at least at the margins, of the presence of "gift or giving." However, equal treatment of patients after they have been admitted is a hollow sort of charity if the ability of a patient to pay for treatment instead simply acts as a bar to admission in the first place.

That question appears to be part of what the third factor is driving at when it looks to "[w]hether the doors are open to rich and poor alike and without discrimination as to race, color or creed." Taxpayer argues that it meets this requirement because it "makes the facility available to patients regardless of race, color, or creed." As the court stated above, the county does not allege any such discrimination and its absence does weigh in taxpayer's favor. That being said, the presence of an "and" in between "open to rich and poor alike" and "without discrimination as to race, color or creed" shows that these are two separate items for consideration. Taxpayer does not address the first of these two items in its briefing, and a failure by taxpayer to show that its doors are indeed "open to rich and poor alike" would severely undermine the case for the presence of "gift or giving." For the reason discussed in the paragraph preceding this one, this would, in turn, jeopardize taxpayer's case for treatment as a charitable institution. It is to that question that the court now turns.

However, in addressing the third factor the court must first make a necessary detour to address the fourth

factor. The fourth factor addresses the fact that taxpayer's services, like those of many healthcare providers, do not come cheaply. The fact that taxpayer charges for its services does not necessarily lead the court to find a lack of "gift or giving." OAR 150-307.130-(A)(3)(d)(C). Likewise, that taxpayer expects patients who are capable of paying the full price for treatment to pay the going rate for treatment is also not a problem. *Gregory v. Salem General Hospital*, 175 Or 464, 469-70, 153 P2d 837 (1944). However, a high price tag alone can amount to a *de facto* ban on patients who lack either sufficient personal assets or sufficient insurance to pay for the treatment if those prices are insisted upon in all cases and if those who cannot afford to pay are denied treatment for no other reason than their inability to pay. A similar effect might also arise where, as here, taxpayer does not insist on charging all of its patients full price, if the criteria used by taxpayer to determine who is to be given discounted care, and how much of a discount to provide, results in the substantial exclusion of the poor and indigent from treatment.

Taxpayer can, and does, remove some of the sting that might arise from the high cost of its treatment through its "patient aid" program. Under that program, the price that taxpayer actually bills its patients for treatment varies depending on criteria chosen by taxpayer that seek to determine the financial resources available to the patient. So to that extent, taxpayer satisfies the fourth "gift or giving" factor described above.

The exact contours of taxpayer's patient aid program during the tax years at issue are, however, of great importance in considering whether taxpayer's doors were truly open to rich and poor alike. As the court understands it, taxpayer's patient aid program has two main components. First, as was mentioned above, taxpayer calibrated the amount that it charged patients to the financial resources available to any given patient. Second, taxpayer accepted roughly one patient per quarter at no charge on referral from the Yamhill County HHS.

The court finds taxpayer's system of need-based reductions in prices charged for treatment especially probative of this issue. The court understands that taxpayer's

system of graduated discounts works on the basis of ten tiers. However, the parties have provided to the court a copy of the worksheet used by taxpayer's employees to determine the level of discount that any individual qualifies for. The court notes that this worksheet only appears to account for six tiers of discount. That is not to say that the discounts offered by taxpayer necessarily "max out" at a 60 percent reduction on charges for treatment, but it does appear that taxpayer's frontline intake staff can apparently only qualify a patient for a 60 percent discount on what that patient would otherwise be charged for treatment. The court understands, from statements contained in taxpayer's response to discovery requests made by the county, that taxpayer granted patient aid at tiers 7 or above in a "few" instances "when an individual patient experiences extreme hardship." However, the record does not contain any indication of the criteria used by taxpayer to determine just when such a hardship had presented itself.

The record does, however, bear out that these exceptions are indeed "few." The county has placed in the record data showing the number and type of charges made to patients at each tier of taxpayer's patient aid program during the tax years at issue in this case. For each of the years at issue in this case, the numbers of patients receiving either residential or extended care at a level of patient aid above tier 6 are very small, relative to taxpayer's overall patient load for that year: 1 out of 274 patients in 2009; 6 out of 309 patients in 2010; and 5 out of 334 patients in 2011. Other patients received discounts at 70 percent or above, but as the court understands the exhibits submitted by the parties, these individuals were not themselves receiving treatment for their own substance addiction, but were instead participants in the family treatment component of another patient's treatment for substance addiction. In any event, the amounts that taxpayer bills such patients is so small, relative to the price of its residential and extended treatment, that the fact taxpayer extended greater-than-normal discounts in those instances is of limited significance.

In viewing these numbers, the court is cognizant of taxpayer's agreement with Yamhill County HHS to treat one patient per calendar quarter free of charge on referral

from the county. This agreement helps taxpayer's case in that it clearly illustrates an intention by taxpayer to make its services available, at least under the right circumstances, to some number of individuals who needed their services but would not be able to pay. It also helps taxpayer's case that taxpayer accepted patients on referral from Yamhill County HHS before entering into a formal arrangement to do so in September of 2010, and accepted more than were called for in the agreement after entering into it.

However, while these patients stand in evidence of considerable generosity on the part of taxpayer, the problem remains that they are very few in number. Furthermore, the distribution of taxpayer's grants of patient aid among the varying tiers on taxpayer's patient aid scale during 2009, 2010, and 2011 calendar years suggests a marked tendency on the part of taxpayer to grant relatively modest discounts off the nominal price of treatment to larger numbers of patients, rather than granting larger discounts to less affluent patients or reducing the list prices for its services. The court understands, of course, that the resources taxpayer is able to devote to patient aid are limited and that taxpayer must make what it considers the best use of those resources. However, the distribution pattern chosen by taxpayer suggests a distinct preference on the part of taxpayer for relatively affluent patients.

The court is particularly concerned with the effect of taxpayer's policy of capping patient aid at 60 percent of the cost of treatment. As the court has noted above, this was a "soft" limit subject to exceptions both for a small number of patients referred to taxpayer by Yamhill County HHS and to exceptions for an even smaller number of individuals that taxpayer determined, by criteria not disclosed to this court, to admit at levels of patient aid above 60 percent. In materials submitted to the court as stipulated exhibits, taxpayer's staff justifies the existence of the soft 60 percent cap on the ground that there is a therapeutic benefit to having its patients make an investment in their recovery from addiction. The court is sympathetic to this view, but in light of taxpayer's high charges for treatment taxpayer's decision to place a soft cap at 60 percent leaves the costs of taxpayer's services out of reach of many people legitimately needing the

types of services that taxpayer provides. To most indigent, and indeed, to most working class individuals, 40 percent of $28,000 is a large sum that could only be acquired, if at all, with a great deal of difficulty and at risk of future financial distress. Placing an across-the-board (albeit porous) cap at 60 percent patient aid suggests some measure of disregard for the needs or circumstances of medium- and low-income individuals.

The fact that taxpayer does not accept payment from Medicare or Medicaid only reinforces that impression, inasmuch as it excludes from taxpayer's pool of potential patients virtually all indigent patients, unless allowed in using criteria not found in the evidence presented to the court regarding taxpayer's patient aid program. Taxpayer readily accepted payment from private insurers, and nothing in the record suggests that taxpayer required out-of-pocket payment from patients whose insurance covered the costs of taxpayer's services, so taxpayer's decision to not accept payment from government insurance programs cannot be ascribed to a desire to ensure that its patients had sufficient "skin in the game" to motivate their recovery.

This is a crucial distinction between taxpayer and other similar institutions that this court has found to be charitable. The court sees parallels between taxpayer's situation and that presented in *Ev. Lutheran Good Samaritan Society v. Department of Revenue*, 5 OTR 14 (1972). In that case, this court explicitly noted a hospital's acceptance of patients paying for treatment through government sponsored welfare programs for the poor as indicative of the charitable nature of that hospital precisely because it showed that the hospital's doors were open to rich and poor alike. *Id*. at 22-23. As has been noted, taxpayer does not accept payment from such welfare programs.

Taxpayer's policy of not accepting payment from welfare programs for the poor also distinguishes this case from the court's decision regarding a somewhat similarly situated addiction treatment provider in *Serenity Lane, Inc. v. Lane County Assessor*, 21 OTR 229 (2013). The amount of money set aside for patient aid in that case was actually less, as a percentage of the revenue of the institution at issue

in that case, than what taxpayer sets aside as a percentage of its own revenue in this case. However, that institution has made significant, long term investments in making its services widely available to the working poor and indigent, as well as to the middle class individuals that made up the bulk of its patients. To make those services available to the poor while also remaining financially viable, the taxpayer in *Serenity Lane* accepted payment from public insurance programs for the poor.

The taxpayer in this case does not accept payment for treatment from government insurance programs, and has instead put policies in place to limit the costs it incurs by treating patients who cannot afford to pay the full price of treatment. These policies, as a practical matter, severely restrict access to taxpayer's services by the indigent, the working poor, and most probably the lower middle class as well. In that sense, taxpayer's doors are not "open to rich and poor alike" in the same way as are those of other institutions that this court has found "charitable" for purposes of ORS 307.130.

On review of the stipulations of the parties, and of the testimony and exhibits adduced at trial, the court does not find that taxpayer has carried the burden of showing that its doors are "open to rich and poor alike." While this need not be dispositive in every case of the presence of "gift or giving" so as to deprive an institution of a finding that it is charitable, the court is of the opinion that it is dispositive here. Taxpayer is clearly an institution that has a noble purpose: it seeks to counter a dreadful blight on our society, and the evidence clearly shows it is prone to generosity in pursuing that mission. However, taxpayer's high prices for treatment, combined with taxpayer's evident priorities in granting relief from the burden of those high prices and taxpayer's refusal to accept payment from government insurance programs aimed at expanding medical access for the poor, suggest that taxpayer's services are specifically targeted at the more affluent segments of our society. An institution with such priorities may be, as here, admirable; but it is not a charity for purposes of ORS 307.130.

Having concluded that taxpayer is not a charitable institution for purposes of ORS 307.130, the court does not

reach the question of whether taxpayer actually and exclusively uses the property at issue in this case in pursuit of a charitable mission.

## V.   CONCLUSION

Now, therefore,

IT IS THE DECISION OF THIS COURT that taxpayer is not a charitable institution for the purposes of ORS 307.130, and is therefore not exempt from ad valorem property tax under that statute.