No. 37     February 9, 2017     349

IN THE OREGON TAX COURT
REGULAR DIVISION

YU CONTEMPORARY, INC.,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant*,
*and*

MULTNOMAH COUNTY ASSESSOR,
*Defendant-Intervenor.*

(TC 5245)

Plaintiff (taxpayer) appealed from a Magistrate Division decision as to exemption from property tax based on taxpayer's nonprofit status. At trial, Defendant-Intervenor Multnomah County Assessor (the county) and Defendant Department of Revenue (the department) argued that taxpayer's property was not exempt because the primary use of the property was not a qualifying use, but was instead mixed with other commercial, non-art displaying uses and activities and therefore any qualifying uses were incidental at best, and not the primary purpose. The department argued that promotion of artists and creation of art was the primary use of the property by taxpayer, rather than the display of art to the public. Finding for taxpayer, the court concluded that the record in the case on actual use supported a conclusion that the property (with certain stipulated exceptions as to portions of the property) satisfied the statutory definition of an art museum, and as such was exempt from property tax.

Trial was held April 5, 2016, in the courtroom of the Oregon Tax Court, Salem.

Michael J. Millender, Tonkon Torp LLP, Portland, argued the cause for Plaintiff (taxpayer).

Carlos A. Rasch, Multnomah County Counsel, Portland, argued the cause for Defendant-Intervenor Multnomah County Assessor (the county).

Daniel Paul, Assistant Attorney General, Department of Justice, Salem, appeared for Defendant Department of Revenue (the department).

Decision rendered February 9, 2017.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This property tax exemption case is before the court after trial. Certain facts were established by stipulation. The year at issue is 2014-15. Plaintiff (taxpayer) asserts that its property, with certain exceptions, is exempt from property taxation. Defendant Department of Revenue (the department) and Intervenor-Defendant Multnomah County Assessor (the county) assert that the property does not qualify for exemption.

## II.   FACTS

A.   *Stipulated Facts*

(1)   Taxpayer is an Oregon public benefit nonprofit corporation that was incorporated on October 15, 2009, under the name "YU Center for the Arts." The incorporators were Aaron Flint Jamison and Curtis Knapp. On March 2, 2011, taxpayer filed Amended Articles of Incorporation that changed its name to "YU Contemporary, Inc."

(2)   Taxpayer's bylaws state that its "primary purpose shall be to provide a permanent national caliber professional arts center for the display of national, regional and local visual and performing arts; to provide infrastructure to promote and support the Portland arts community; to create a vehicle to expose contemporary arts and the Portland art community to the City of Portland and the nation at large; and to provide other activities and services that are necessary or appropriate to carry out these purposes."

(3)   On January 25, 2011, the Internal Revenue Service granted taxpayer's application for exemption from tax under 26 USC 501(c)(3), with an effective date of September 15, 2009.

(4)   Taxpayer files annual returns with the IRS on Form 990. Taxpayer's Form 990s state that "YU is a center for contemporary art in Southeast Portland, Oregon. It is led by a desire to support emerging and under-acknowledged contemporary artists, propose new modes of production, and stimulate the ongoing public discourse around art."

(5)   Taxpayer's activities are overseen by its Board of Directors, whose size has grown from four to eight members. The Board of Directors meets quarterly.

(6)   During the 2013-15 period, Taxpayer applied for and received grants to support its general operations from the following organizations: The Foundation for Contemporary Arts, the Andy Warhol Foundation for the Visual Arts, the Autzen Foundation, the Foundation for Contemporary Arts, the Oregon Arts Commission, the Schwabe Charitable Fund, the Henry Lea Hillman, Jr. Foundation, and the James F. & Marion L. Miller Foundation.

(7)   Taxpayer also received funding from the Meyer Memorial Trust, the Kinsman Foundation, and HCP, Inc. for the specific purpose of making necessary upgrades to its real property.

(8)   Additionally, taxpayer has two tiers of membership opportunities. Members who contribute between $60 and $1,199 annually receive discounted entry to concerts, mailed invitations to exhibits, previews of exhibits, and an invitation to taxpayer's yearly member and volunteer event. Members who contribute $1,200 or more annually are also invited to attend Board meetings, invited to taxpayer's annual staff dinner, and are given keycard access to taxpayer's building during regular office hours for taxpayer-related purposes.

(9)   Taxpayer owns real property, known as the Yale Union Laundry Building, which is located at 800 SE Tenth Avenue in Portland (the "property").

(10)   On October 16, 2013, Alter, LLC, an Oregon limited liability company ("Alter"), donated the property to taxpayer by special warranty deed.

(11)   The property is identified by the Multnomah County Assessor as account number R150452.

(12)   The property is approximately 28,800 square feet in total.

(13)   The property contains an upstairs ballroom or gallery that is taxpayer's primary space used for cultural events and private rentals. Prior to renovations in

2014, taxpayer also maintained a downstairs ballroom that it used for the same purposes. As part of the 2014 renovations, the downstairs ballroom was remodeled and divided into taxpayer's administrative offices and the commercially leased space described in paragraph 14, below.

(14)   4,647 square feet of the property is leased to commercial tenants (the "Leased Space"). The Leased Space was taxable during the 2014-15 tax year.

(15)   Since taxpayer acquired the property on October 16, 2013, it has held cultural events at the property including, but not limited to, those described in paragraphs 16 through 47, below.

(16)   Between October 5 and December 1, 2013, taxpayer exhibited manuscripts by poet Susan Howe. Admission to the exhibition was free. In addition to taxpayer's general sponsors, sponsors of the exhibition included The Fields Fund of the Oregon Community Foundation, Work for Art, Vista Capital, Umpqua Private Bank, and Literary Arts.

(17)   In connection with the Howe exhibition, Marjorie Perloff, Professor Emerita of English at Stanford University, gave a talk at the property on November 9, 2013.

(18)   Between November 15 and December 1, 2013, taxpayer exhibited a video installation by artist Liz Magic Laser. Admission to the exhibition was free. In addition to taxpayer's general sponsors, sponsors of the exhibition included Work for Art, Vista Capital, and Umpqua Private Bank.

(19)   Between April 26 and June 29, 2014, taxpayer exhibited a visual art installation by Japanese artist Yuji Agematsu. In addition to taxpayer's general sponsors, sponsors of the exhibition included The Fields Fund of the Oregon Community Foundation, Work for Art, Vista Capital, Umpqua Private Bank, and Literary Arts.

(20)   In connection with the Agematsu exhibition, taxpayer presented the following auxiliary programs at the property: a talk by Andrew Lampert, a filmmaker and film scholar, on May 31, 2014; a performance by Graham

Lambkin, a musician, on June 8, 2014; and an installation of a performance tape by Japanese choreographer Tatsumi Hijikata, which ran throughout the exhibition.

(21)   Between September 5 and October 19, 2014, taxpayer exhibited an audio/visual installation by artist Park McArthur. Admission was free. In addition to taxpayer's general sponsors, sponsors of the exhibition included Jason Hirata, Umpqua Private Bank, and Work for Art.

(22)   In connection with the McArthur exhibition, Vanessa Place and Alex Fleming performed a reading at the property on September 5, 2014. Vanessa Place is a writer and criminal appellate attorney from Los Angeles and Alex Fleming is an artist from New York.

(23)   Between November 8 and December 21, 2014, taxpayer exhibited a sculpture and visual arts installation by British sculptor and artist Terry Atkinson. Admission to the exhibition was free. In addition to taxpayer's general sponsors, sponsors for the exhibition included Umpqua Private Bank and Work for Art.

(24)   In connection with the Atkinson exhibition, Terry Atkinson and guest curator Richard Birkett gave a talk at the property on November 9, 2014.

(25)   On March 13 and 14, 2015, taxpayer presented a performance and video installation by visual artist and musician Charlemagne Palestine. Admission to the exhibition was free. In addition to taxpayer's general sponsors, sponsors for the performance included the Regional Arts & Culture Council, Pacific Northwest College of Art, and the Martin family.

(26)   Between May 30 and July 19, 2015, taxpayer exhibited an installation by Willem Oorebeek, a Dutch artist who works with photography and print media. In addition to taxpayer's general sponsors, sponsors for the exhibition included The Mondriaan Fund and the Martin family.

(27)   Between August 1 and September 6, 2015, taxpayer exhibited the works of Richard Hawkins, Jason Simson, Lily van der Stokker, Leidy Churchman, and

Clement Rodzielski in a partnership with the Paris art gallery castillo/corrales. Admission to the exhibition was free. In addition to taxpayer's general sponsors, sponsors for the exhibition included the Consulate General of France (San Francisco) and the Martin family.

(28) In connection with the castillo/corrales exhibit, taxpayer presented a performance at the property on August 1, 2015, by Jeff Witscher, a musician, and a talk at the property on August 2, 2015, by Richard Hawkins, one of the artists in the exhibit.

(29) Between October 10 and December 20, 2015, taxpayer exhibited a group show called MOMMY, a mixture of sculptures and other visual art. Admission to the exhibition was free.

(30) In connection with the MOMMY exhibit, taxpayer presented a performance at the property on November 14, 2015, by Karin Schneider, an artist, and a screening on December 18, 2015, by Paul McCarthy, a painter and performer.

(31) Since October 16, 2013, taxpayer has also presented a number of musical performances and other cultural programs at the property.

(32) Between January 4 and February 6, 2014, taxpayer and the Northwest Film Center co-presented a documentary film series, with related talks by guest speakers, titled "The Devil, Probably." Showings were held in Whitsell Auditorium at the Portland Art Museum, but the following speakers used studios at the property during their visits to Portland: Thomas Beard, Programmer at Large for the Film Society of Lincoln Center, January 10-13, 2014; Hartmut Bitomsky, a German filmmaker and producer, January 17-20, 2014; Thom Andersen, a filmmaker, film critic, and faculty member at the California Institute of the Arts, January 23-26, 2014; and Andy Rector, an actor, February 1-3, 2014.

(33) On February 28, 2014, taxpayer presented a performance at the property by Lubomyr Melnyk, a composer and pianist.

(34)   On March 22, 2014, YU and Reed College co-presented a performance of electronic compositions by Madalyn Merkey. The performance was held at Reed, but Madalyn Merkey used studios at the property during her visit to Portland.

(35)   On April 4, 2014, taxpayer presented a musical performance at the property by Evol, a computer musical performance group. The artists also used studio space at the property.

(36)   On April 22, 2014, taxpayer presented Representative Earl Blumenauer's annual Congressional Art Competition for young people who live in his district.

(37)   On May 30, 2014, taxpayer presented a reading and film screening at the property by Andrew Lampert. Andrew Lampert used a studio at the property during his visit to Portland from May 29 to June 2, 2014.

(38)   On November 15, 2014, taxpayer presented a talk at the property on publishing and printed matter by James Hoff, an artist. James Hoff used a studio and the print shop at the property during his visit to Portland between November 14 and 17, 2014.

(39)   On November 21, 2014, taxpayer presented a performance of electronic experimental music at the property by DJ Stingray. DJ Stingray used a studio at the property as a green room.

(40)   Between November 22 and December 2, 2014, Lucas Quigley, a visiting curator, used a studio at the property.

(41)   On February 8, 2015, taxpayer presented a screening and talk at the property by Mike Kuchar, a filmmaker.

(42)   On February 27, 2015, taxpayer presented a performance at the property by Mark Fell, a British musician.

(43)   Between March 19 and 23, 2015, taxpayer and the Portland Institute for Contemporary Art co-presented a dance residency at the property by Sarah Michelson, a British dancer and choreographer.

(44)    On April 10, 2015, taxpayer presented a performance at the property by Loren Connors, a musician from New York.

(45)    On May 2, 2015, taxpayer presented a performance at the property by Keyon Gaskin, a performance artist.

(46)    On June 6, 2015, taxpayer presented a talk and performance at the property by Elysia Crampton, a musician.

(47)    On November 5, 2015, taxpayer presented a performance at the property by M.E.S.H., a German music producer.

(48)    In addition to the exhibitions, performances and other programming listed above in paragraphs 16-47, above, taxpayer rented out space at the property to individuals, companies, and groups for their events between October 16, 2013 and December 31, 2015, as described in paragraphs 49-78, below:

(49)    Between December 7 and 8, 2013, the upstairs ballroom was rented out for the Laika Holiday Party for $5,800.

(50)    Between December 13 and 14, 2013, the upstairs ballroom was rented out for the Smarsh Holiday Party for $8,400.

(51)    Between October 13 and December 21, 2013, taxpayer earned approximately $14,200 in income from event rentals.

(52)    Between January 4 and 5, 2014, the upstairs ballroom was rented out for the Williams Wedding for $5,200.

(53)    On January 18, 2014, the upstairs ballroom was rented out for the Frey Wedding for $3,450.

(54)    Between February 7 and 9, 2014, the upstairs and downstairs ballrooms were rented out for The One Motorcycle Show for $15,000.

(55)    On March 8, 2014, the upstairs ballroom was rented out for the Nishida Wedding for $3,800.

(56)    Between March 14 and 17, 2014, the upstairs ballroom was rented out for the Nike, Inc., Offsite Brand Leadership Briefing for $9,600.

(57)    Between May 17 and 18, 2014, the upstairs ballroom was rented out for the Buckman Arts Focus Elementary School Gala and Auction for $5,150.

(58)    On May 24, 2014, the upstairs ballroom was rented out for the Chau Wedding for $3,000.

(59)    On June 28, 2014, the upstairs ballroom was rented out for the Johnson Wedding for $2,400.

(60)    On August 9, 2014, the upstairs ballroom was rented out for the Brown Wedding for $3,450.

(61)    Between August 16 and 17, 2014, the upstairs ballroom was rented out for the Heino Wedding for $4,150.

(62)    Between August 30 and 31, 2014, the upstairs ballroom was rented out for the Gilbert Wedding for $5,350.

(63)    Between September 12 and 14, 2014, the upstairs ballroom was rented out for XOXO for $20,000.

(64)    Between October 25 and 26, 2014, the upstairs ballroom was rented out for the Valadez Wedding for $7,000.

(65)    In 2014, taxpayer earned approximately $87,550 in income from event rentals.

(66)    On January 2, 2015, the upstairs ballroom was rented for the Moore Wedding for $2,500.

(67)    Between January 20 and 21, 2015, the upstairs ballroom was rented out for the Nike Leadership Offsite for $7,350.

(68)    Between April 25 and 26, 2015, the upstairs ballroom was rented out for the Buckman School Auction for $6,000.

(69)    Between May 24 and 25, 2015, the upstairs ballroom was rented out for the Dahle Wedding for $5,175.

(70)    Between June 27 and 28, 2015, the upstairs ballroom was rented out to Julie Miller for $6,150.

(71)   Between September 10 and 13, 2015, the upstairs ballroom was rented out for XOXO for $20,000.

(72)   Between October 16 and 17, 2015, the upstairs ballroom was rented out for the O'Leary Wedding for $5,250.

(73)   On November 7, 2015, the upstairs ballroom was rented out for the Attar Wedding for $4,800.

(74)   Between December 5 and 6, 2015, the upstairs ballroom was rented out for the Valari Wedding for $5,250.

(75)   On December 12, 2015, the upstairs ballroom was rented out for the Ruby Receptionists Holiday Party for $3,900.

(76)   Between December 19 and 20, 2015, the upstairs ballroom was rented out for the Puppet Labs Holiday Party for $5,250.

(77)   In 2015, taxpayer earned approximately $71,625 in income from event rentals.

(78)   Between October 16, 2013 and December 31, 2015, taxpayer earned approximately $173,375 in income from event rentals.

(79)   Between October 16, 2013 and December 31, 2015, taxpayer presented nine exhibitions and 23 musical performances and other cultural programs at the property, and it rented out space at the property for 26 private events.

(80)   Prior to June 2014, Chroma Games, Inc., a Delaware corporation ("Chroma"), was among the tenants in the Leased Space.

(81)   On July 25, 2013, Chroma filed an Amendment to Annual Report/Information Statement with the Oregon Secretary of State to reflect that the property was its principal place of business and mailing address.

(82)   Upon vacating the Leased Space in June 2014, Chroma did not amend its Annual Report/Information Statement with the Oregon Secretary of State to reflect that the property was no longer its principal place of business and mailing address.

(83)   On February 23, 2015, Chroma filed an Amendment to Annual Report/Information Statement to reflect its new principal place of business and mailing address.

(84)   On April 4, 2014, Alter filed an Amendment to Annual Report/Information Statement with the Oregon Secretary of State that listed the property as its principal place of business.

(85)   On February 24, 2015, Alter filed Articles of Dissolution with the Oregon Secretary of State. The Articles of Dissolution stated that the date of dissolution was October 18, 2013.

(86)   Prior to March 15, 2013, Marriage Records, LLC ("Marriage Records") listed the property as its principal place of business and mailing address with the Oregon Secretary of State.

(87)   On March 15, 2013, approximately six months before Alter donated the property to taxpayer, Marriage Records was administratively dissolved by the Oregon Secretary of State.

(88)   Emprint Press is an assumed business name that was registered with the Oregon Secretary of State by Emily M. Johnson on April 14, 2011.

(89)   Emily M. Johnson conducts a letterpress printing business under the name Emprint Press. She used printing equipment at the property during the relevant time period.

(90)   In both the initial assumed business name registration and in a renewal of registration filed on April 2, 2013, Emily M. Johnson listed the property as her principal place of business and mailing address.

(91)   The Oregon Secretary of State terminated the assumed business name registration for Emprint Press on April 15, 2015, for failure to renew.

(92)   From December 15, 2008 to January 19, 2016, Aaron Flint Jamison listed the property's address as his own with the Oregon Department of Motor Vehicles ("DMV").

(93) From June 6, 2013 to September 19, 2014, Thomas E. Blood listed the property's address as his own with the DMV.

(94) On August 24, 2007, and again on March 4, 2010, and May 17, 2012, Erik W. Gage listed the property's address as his own with the DMV.

(95) On May 29, 2013, Thomas E. Blood listed the property's address as his own in order to register to vote in Oregon.

(96) On July 2, 2013, Robert G. Snowden listed the property's address as his own with the DMV to register a certificate of title for a vehicle.

(97) Based on Robert G. Snowden's representations to the DMV, the Multnomah County Circuit Court used the property's address in a general judgment entered against him on September 23, 2014, for a moving violation with the same vehicle.

(98) On August 22, 2014, Robert G. Snowden listed the property's address as his own in order to register to vote in Oregon.

(99) On July 15, 2013, Emily M. Johnson listed the property's address as her own with the DMV.

(100) Also on July 15, 2013, Emily M. Johnson listed the property's address as her own in order to register to vote in Oregon.

(101) On December 18, 2013, Curtis J. Knapp listed the property's address as his own with the DMV.

(102) Taxpayer timely applied for a property tax exemption for the 2014-15 year on or about October 16, 2013.

(103) On July 1, 2014, the county conducted an inspection of the property as part of its investigation into the exemption application.

(104) On September 9, 2014, the county denied taxpayer's application.

(105) Taxpayer timely appealed the county's denial of its exemption by filing a complaint in this matter on December 8, 2015.

B.  *Facts Found After Trial*

The court makes the following findings of fact based on the evidence adduced at trial:

(1)  Although certain individuals used the address of the property on filings with the Department of Motor Vehicles or other agencies, no individual used the property as a residence during the year at issue.

(2)  Although the assessor's employee observed items of personal property in the building at the time of her visit and concluded that a person or persons used the property for temporary residential purposes, no such use occurred. The employee of the assessor was simply mistaken.

(3)  Taxpayer holds itself out to the public as an organization that uses its real and personal property for the display of art, including two or three dimensional works of art, artistic printing, music, and the education of the public in all these areas.

(4)  Use of taxpayer's property for rentals to nonexempt third parties is an incidental use of the property.

(5)  Use of the property in question by members of the board of directors of taxpayer and donors is incidental to the primary exempt use of the property by taxpayer.

(6)  The primary use of the property by taxpayer is for the display of art to the public and activities in conjunction with such use. No part of the property is used for the sale of works of art or other activities specified in ORS 307.130(2)(f).[1]

### III.  ISSUE

The issue is whether the property of taxpayer for which exemption is claimed is in fact exempt.

---

[1] Unless otherwise indicated, the court's references to the Oregon Revised Statutes (ORS) are to the 2013 edition.

## IV.   ANALYSIS

At the outset, taxpayer concedes that those portions of the property leased to third-party nonexempt lessees are not qualified for exemption. Additionally, the court is of the opinion that the portion of the property operated as a print shop by a third party is not qualified for exemption. Although no cash rent is paid for use of such space, the user of the space provides services to taxpayer. Exchange of services for the right to occupy space is no different from the exchange of cash for such right. This portion of the property therefore falls under the same rule as those portions leased for cash.

The statute under which taxpayer claims exemption is ORS 307.130, titled "Property of art museums, volunteer fire departments or literary, benevolent, charitable and scientific institutions," which provides, in relevant part:

"(1)   As used in this section:

"(a)   'Art museum' means a nonprofit corporation organized to display works of art to the public.

"* * * * *

"(c)   'Nonprofit corporation' means a corporation that:

"(A)   Is organized not for profit, pursuant to ORS chapter 65 or any predecessor of ORS chapter 65; or

"(B)   Is organized and operated as described under section 501(c) of the Internal Revenue Code as defined in ORS 305.842.

"* * * * *

"(2)   Upon compliance with ORS 307.162, the following property owned or being purchased by art museums, volunteer fire departments, or incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a)   Except as provided in ORS 748.414, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions.

"* * * * *

"(f)  The real and personal property of an art museum that is used in conjunction with the public display of works of art or used to educate the public about art, but not including any portion of the art museum's real or personal property that is used to sell, or hold out for sale, works of art, reproductions of works of art or other items to be sold to the public.

"* * * * *

"(3)  An art museum or institution shall not be deprived of an exemption under this section solely because its primary source of funding is from one or more governmental entities.

"(4)  An institution shall not be deprived of an exemption under this section because its purpose or the use of its property is not limited to relieving pain, alleviating disease or removing constraints."

A.  *Time Perspective for Analysis*

At trial, the court requested the parties to address in post-trial briefing the question of the time perspective that should be used in analyzing the issue in the case. The court could analyze the use of the property either (1) at the time of application for exemption, up to perhaps the beginning of the tax year (July 1) of which exemption is being sought, or (2) during the tax year of which exemption is being sought, up to the time that an assessor approves or denies an application.

The parties appear to be of one view on this question and the court accepts that view. The issue of exemption should be based on the assertions in an application for exemption, that is, on a "looking forward" basis from the beginning of the tax year. Having granted an exemption, an assessor can audit actual use or respond to reports of changes in use. *See* ORS 307.162(7) (requiring institutions exempt under ORS 307.130 to report changes in use of the property to a nonexempt use). If those actions or others justify a revocation of exemption, that can be done, even for a limited number of past years by use of the omitted property statutes. *See* ORS 311.205 - 311.235; *e.g., Erickson v. Dept. of Rev.*, 17 OTR 324 (2004) (approving use of omitted property statutes to reach to loss of exemption resulting from

sublease of property not in conformity with claimed exemption statutes).

B.   *Exemption for Art Musuems*

A specific provision is found in ORS 307.130 regarding exempt status for the property of art museums. Although the department and county suggest otherwise, the court is of the view that the requirements of the specific statute are to apply. Those provisions were added by amendment to the statute and are not simply a rephrasing of requirements of the statute applicable to several other types of organizations.[2] Or Laws 1997, ch 599, § 1 (adding art museum provisions).

Accordingly, the court addresses the elements of the statutory definition of an art museum.

The first requirement is that the owner be a nonprofit corporation, a fact that is stipulated. The next requirement is that the corporation be organized to display works of art to the public. The record conclusively demonstrates that taxpayer is organized to display works of art to the public. The exhibitions it sponsors are well within the ordinary meaning of the term "display," defined as "a presentation by representation or narrative **:** *** an exhibiting or showing of something **:** an unfolding or opening out to view." *Webster's Third New Int'l Dictionary* 654 (unabridged ed 2002).

The record also conclusively demonstrates that what is displayed are "works of art." That term is defined as "**1 :** a product of one of the fine arts *** **:** a painting or sculpture of high artistic quality **2 :** an act or thing giving high aesthetic satisfaction to the beholder or auditor **:** something that has value or gives pleasure apart from its practical effect or usefulness[.]" *Webster's Third New Int'l Dictionary* 2635 (unabridged ed 2002). Accordingly, the term includes not only the two- or three-dimensional creations of artists that are displayed, but also the musical performances and film events that also occur on the property.

---

[2] That is not to say that a property qualifying for exemption as an art museum could not, in some cases, also qualify for exemption under other provisions of ORS 307.130, a question the court does not address.

The record also conclusively supports the conclusion that the display occurs primarily, if not exclusively, for the public in general, or at least that portion of the populace that is attracted to the offerings made by taxpayer.

The statute provides exemption for so much of the property as is "used in conjunction with the public display of works of art or used to educate the public about art." ORS 307.130(2)(f). With respect to the phrase "educate the public about art," the court makes the following observations. The word "art" standing alone has the ordinary meaning of "application of skill and taste to production according to aesthetic principles : the conscious use of skill, taste, and creative imagination in the practical definition or production of beauty[.]" *Webster's Third New Int'l Dictionary* 122 (unabridged ed 2002). While a visual form of art might be conventionally traditional, it can also include music, film and other expressions with beauty or emotional power. The record conclusively demonstrates that most, if not all, of the activities of taxpayer also involve education about art provided to the public.

Taxpayer argues that the use requirement of the statute, "used in conjunction," is less demanding than the requirement found in ORS 307.130 for other types of organizations. For those other types of organizations, property must be "actually and exclusively occupied or used."[3] *See* ORS 307.130(2)(a). Taxpayer argues that the use of property by an art museum must only be "to some degree" connected with activities that the statute specifies as art museum activities. With that position Defendants disagree, asserting that the "actually and exclusively" requirement applicable to other exemptions under ORS 307.130 must apply to art museums.

The court need not decide this issue. Even if the use requirement applicable to other exemptions under ORS 307.130 is applicable to art museums, the record conclusively establishes that the primary use of the property at issue is for the display of art and education about art.

---

[3] Case law has established that "actually and exclusively" is given a fairly liberal reading, such that primary use will support exemption. *See German Apost. Christ. Church v. Dept. of Rev.*, 279 Or 637, 569 P2d 596 (1977).

Importantly, the department appears to agree that the use of the property by taxpayer is primarily for the display of art and related education. The department does not assert that occasional use of the property for weddings and receptions makes the exemption unavailable.[4] Nor does the use of portions of the property for offices and support functions fall outside the statute. If the legislature meant to exempt only a display room, and not the offices and supporting spaces needed for the display, it would have said so. The spaces involved here are the equivalent of supporting space that is routinely found to be exempt when it is used in support of an exempt function and not used primarily for a nonexempt function. The record indicates that the spaces at issue are used directly for display or bear an acceptable relationship to the display activity.

With the foregoing conclusions of the court the county and the department disagree. To those disagreements the court now turns.

C.   *Disagreements of the County*

The county generally asserts that what it considers the qualified use of the property is "so mixed with other commercial-non-art displaying *** endeavors, that any art *** is incidental at best, and certainly not primary."

This assertion is unsupported in the record. The court finds that the qualifying activities on the property are primary. And, as noted above, the department appears to agree. The court also notes that the areas that are leased to nonexempt users are distinct from those used by taxpayer.

The county asserts that exhibitions of art only occur from time to time and therefore the activities of taxpayer do not render the property exempt. The evidence is that exhibitions occupied 363 out of 807 days in a period of over two years. The county then asserts that days when exhibitions

---

[4] Neither the county nor the department assert that any portion of the property at issue is used "to sell, or hold out for sale, works of art, reproductions of works of art or other items to be sold to the public." *See* ORS 307.130 (2)(C)(f). That partial exclusion from exemption of art museums therefore is not at issue.

are not being made must count against taxpayer in considering the primary use of the property. That assertion finds no basis in the statutes, any rule of the department, or any case. There is no statutory requirement that property that otherwise qualifies for exemption must be continuously used for the exempt purpose, so long as nonexempt *uses* do not become primary. There is nothing in the record that nonexempt uses occur on "down days," except perhaps the use of space for events such as meetings and weddings. As discussed above, that use is incidental to the exempt uses made by taxpayer of the property.

The county next asserts that the purpose of taxpayer is not to display art to the public but rather to "support the artists themselves."[5] The county says that taxpayer's practice is to "pay artists to come and work on their artwork" and that taxpayer gives artists "work spaces for free" so that artists "can come and work on their exhibits for sometimes months at a time."

The record simply does not support these contentions. In discussing this point, it must be remembered that the question at hand is the use of property, not the expenditure of funds by taxpayer. Taxpayer does pay an honorarium to artists and it appears that taxpayer defrays costs of artists. However, the use of the property at issue in this case is for the preparation of display areas and furniture (such as tables) and the planning for, or finalization of displays of art, often art that is displayed over a significant area. The property is also used for educational events and music events. Music is an art form and education about art is within the definition of an art museum.

Other uses of the property at issue are for administration, fundraising, and support activities related to the completion of exhibit installations. The inspection done by the county before its decision on exemption was cursory at best and the witness for the county concluded that not much of the space in the property was being used. That witness

---

[5] The county also claims that the artists are emerging and unknown artists. Even if that were true, the county made no record on this point, and can point to no requirement in the statutes or rules of the department that impose a requirement that displayed art must be from established and famous artists.

did not take into account the fact that the date of the visit occurred just after completion of one exhibit and in what are significant periods of time between exhibits. The witness also did not take into account that taxpayer is in its organizational and operational infancy, or that on the day of the visit taxpayer was in the process of making major moves of activity areas due to repositioning of exempt and non-exempt activities.

The positions of the county as to the use of the space in question are not supported by the record or the law.

The county, focusing on the statutory phrase "art museum," points to the founder of taxpayer and his conception that the property is a Kunsthalle. Seizing on this testimony, the county concludes that the property is not an art museum. That is getting things backwards. One must start, and end, with the statutory definition. Property fitting the definition—property used for the display of art and education about art—is exempt because it is, by statute, considered an "art museum." That conclusion follows regardless of the personal conception that the founder may have about the name used to describe the property.

D.   *Disagreements of the Department*

The department suggests that the organizational documents of taxpayer bear on the question of the exemption for the property. There are cases that indicate that organizational documents may have some bearing. However, the department has not by rule provided that such organizational documents are conclusive. In its written closing argument, the department wisely concludes that actual activity and use of property should govern. The court has concluded that the record in this case, on actual use, conclusively supports a conclusion that the property satisfies the definition of an art museum.

The department also concludes that promotion of artists and creation of art is the primary use of the property by taxpayer, rather than the display of art to the public. The department concludes that "the creation of art is primary and the display of that art is secondary or incidental." In this, the department makes the same mistake as the

county. The record establishes that the art displayed in the space at issue is often, if not always, significant in size and distribution in space. The art is often, if not always, something other than a painting that can be executed offsite and easily brought onsite for display.

The department also makes the same mistake as the county with respect to the use of the property to support artists as opposed to displaying art. This may stem from the fact that the assessor's employee who made one visit on one day to the property mistakenly concluded that the property was used to provide housing to artists. The record conclusively establishes that such use of the property does not occur.

## V.    CONCLUSION

The court finds that the property at issue is exempt as being property used by taxpayer primarily in activities that are described in the "art museum" provisions of the statute. There are two exceptions. The first is as to areas the parties have stipulated are leased to third parties. A similar conclusion follows as to the area used by a third party as a print shop, for the reason set out at the beginning of this Opinion.

The parties are directed to confer about the areas used by the printing operation and other uses by nonexempt users. If they cannot agree on the proportion of the space used for that, further proceedings will be scheduled. Now, therefore,

IT IS THE OPINION OF THIS COURT that the parties will confer as directed and report to the court the results of such conferral.