IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| 100 LANGUAGES<br>dba StudioLingua, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 240511N |
| | ) | |
| v. | ) | |
| | ) | |
| MULTNOMAH COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals Defendant's denial of property tax exemption to property identified as Account R200722 (subject property) for the 2024-25 tax year. Defendant moved for summary judgment and the parties filed written briefings on that motion.

I. STATEMENT OF FACTS

The subject property is a pre-school facility composed of 875 square feet, including one classroom area, bathrooms and common space. (Joint Ex 7; Joint Ex 1 at 1, ¶ 1; Joint Ex 8 at 2.) The subject property is owned by St. Phillip Neri Catholic Church under the Archdiocese of Portland in Oregon. (Joint Ex 1 at 1.) Plaintiff leases the subject property on a yearly basis. (*Id.* at 15, ¶ 2.) Plaintiff operates an Italian-immersion pre-school for children ages three through five at the subject property. (Joint Ex 2 at 1, ¶ 1-2.) Plaintiff is certified with the Oregon Office of Child Care under ORS 329A.280. (Stip Facts at 3, ¶ 7; Joint Ex 6 at 2.) Plaintiff's first lease of the subject property ran from October 1, 2023, through August 30, 2024. (Stip Facts at 2, ¶ 2; Joint Ex 8 at 1.) Plaintiff "shut its doors temporarily from July through August 2024 due to staff turnover." (Stip Facts at 6, ¶ 24; *see also* Joint Ex 15 at 2.)

/ / /

/ / /

A.    *Plaintiff's Organizational Structure and Activities*

Plaintiff is organized as a public benefit nonprofit corporation under ORS Chapter 65 that is exempt from federal taxation under Internal Revenue Code (IRC) Section 501(c)(3).  (Stip Facts at 3, ¶ 6; Joint Ex 3, 4.)  Plaintiff is controlled by a governing board, all of whom serve on a volunteer basis.  (Joint Ex 17 at 3.)  According to Plaintiff's mission statement:

> "Studio*Lingua* provides a safe and nurturing bilingual environment for children to explore, grow, and learn.  Language and culture go hand in hand, and we strive to create an immersive and inclusive Italian preschool experience that will help our students acquire the language and develop a multicultural worldview."

(Joint Ex 2 at 5.)  Plaintiff offers regular preschool services at costs ranging from $1,000 per month for three days to $1,300 per month for five days.  (Joint Ex 10 at 1.)  Plaintiff offers early drop-off and after school care for an additional charge.  (*Id*.)  To apply for services, families must pay a $200 application fee, along with a $1,000 deposit that is applied to the student's last month of tuition.  (*Id*.; Stip Facts at 4, ¶ 15.)  "The scheduled tuition charges are at or above the market rate for child care."  (Stip Facts at 4, ¶ 14.)

Money received from tuition is used to pay for the operation of the pre-school program. (Stip Facts at 4, ¶ 16.)  Plaintiff's budget for September 2024 states that it earned approximately $17,867 in income, of which $14,831 was from tuition and $3,036 was from donations and grants.  (Joint Ex 16 at 1.)  Plaintiff paid expenses totaling $16,665, including $1,750 in rent and $12,745 in labor and taxes.  (*Id*.)  Plaintiff ended the month with a balance of $1,201.  (*Id*.)  An enrollment schedule for the 2024-25 year anticipated monthly tuition totaling $16,531 for 12 children.  (Joint Ex 13 at 3.)

Between February and March 2024, Plaintiff offered twelve "weekend enrichment classes" that were free to the public.  (Stip Facts at 5, ¶ 23.)  Those classes included Italian-immersion courses on music, cooking, and art along with magic shows.  (*Id*.; Joint Ex 14.)  The

classes were advertised as open to children of all ages, but seven of the twelve classes offered included age recommendation for students aged 5-10 years. (Joint Ex 14.) Plaintiff was "reimbursed" $2,996 by Comites of San Francisco for class costs, excluding volunteer time. (Joint Ex 15 at 3.) Plaintiff has not hosted a weekend enrichment class since July 1, 2024, but plans to host such classes in the future. (Stip Facts at 6, ¶ 23; Joint Ex 15 at 2.)

B.      *Plaintiff's Financial Aid Options*

Plaintiff offers two forms of financial aid to its students. (Stip Facts at 4, ¶ 17; Joint Ex 10 at 2.) First, Plaintiff accepts funds from the Employment Related Day Care (ERDC) program through the State of Oregon. (*Id.*) To date, Plaintiff has not received funds through the ERDC for any of its students. (Stip Facts at 5, ¶ 19.)

Plaintiff's second form of financial aid is an in-house tuition assistance program. (Stip Facts at 5, ¶ 17.) To be eligible for this program, the student's family must earn below 80 percent of the area's median income. (*Id.*; Joint Ex 10 at 2.) Qualifying families pay eight percent of their gross annual income divided by nine months. (Stip Facts at 5, ¶ 18.) As of October 23, 2024, Plaintiff had twelve enrolled students, none of whom received financial aid through either program. (*Id.* at ¶ 21.) In November 2024, one additional student enrolled who qualified under the in-house financial aid program. (*Id.*) The family paid a discounted rate of $611 per month for tuition that ordinarily costs $1,850, indicating the family received financial aid amounting to $1,239 per month. (*Id.* at ¶ 22.)

C.      *Plaintiff's Property Tax Exemption Application Denial*

Plaintiff applied for a property tax exemption as a childcare facility or school under ORS 307.145. (Stip Facts at 3, ¶ 8; Joint Ex 7 at 1.) Plaintiff initially filed its exemption application with Defendant on December 22, 2023, for the 2023-24 tax year. (Stip Facts at 3, ¶ 8.)

However, Defendant's tax exemption specialist "notified Plaintiff that [it] was ineligible" for the 2023-24 tax year, because Plaintiff did not begin operations until October 2023. (*Id*. at ¶ 9.) With Plaintiff's permission, the specialist changed the application year to 2024-25. (*Id*. at 4, ¶ 11.) Defendant then denied Plaintiff's application for the 2024-25 tax year based on its conclusion that Plaintiff's use did not "qualify in accordance with ORS 307.166." (*Id*. at ¶ 12.)

## II. ANALYSIS

The issue in this case is whether the subject property qualifies for property tax exemption under ORS 307.145 for the 2024–25 tax year.[1] The parties disagree whether Plaintiff engages in sufficient "gift or giving." Defendant raises two threshold timing issues: 1) whether the subject property was eligible for exemption for the 2024-25 tax year due to its temporary closure from July to August 2024; and 2) whether evidence predating the 2024-25 tax year may be considered.

Summary judgment is proper where, construing the facts in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact" such that "the moving party is entitled to prevail as a matter of law." TCR-MD 13 B; TCR 47 C.[2] Neither party has identified any material facts in dispute. As the party seeking relief, Plaintiff ultimately bears the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "preponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). Property tax exemptions are strictly but reasonably construed against the taxpayer claiming exemption. *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 88-89, 817 P2d 1292 (1991).

/ / /

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2023.

[2] Tax Court Rules-Magistrate Division (TCR-MD) and Tax Court Rules (TCR).

A.      *Eligibility of Subject Property for Exemption, Relevant Period of Review*

Defendant makes two timing arguments for the 2024-25 tax year. First, Defendant argues that, due to Plaintiff's temporary closure from July through August 2024, Plaintiff was not actively operating on July 1, 2024, – the start of the 2024–25 tax year – so Plaintiff is not entitled to a property tax exemption under ORS 307.162. (Def's Mot Summ J at 8, Reply at 2.) Second, and relatedly, Defendant argues that Plaintiff's weekend enrichment classes cannot be considered in this analysis because they occurred before the start of the 2024-25 tax year. (Def's Mot Summ J at 8.) Plaintiff opposes both arguments, questioning why Defendant requested information from the 2023-24 tax year if it was irrelevant, and notes that it continued to incur operational costs during July and August 2024. (Ptf's Opp'n to Def's Mot Summ J at 8-9.)

A brief explanation of the tax year and the timing of exemption claims is helpful here. The "tax year" is a 12-month period beginning on July 1, and it corresponds to an "assessment year" which is the calendar year. ORS 308.007(1)(b), (c). The "assessment date" for both periods is January 1. ORS 308.007(2). Under ORS 307.162 – cited by Defendant – exemption claims must be filed by "April 1 preceding the tax year for which the exemption is claimed." ORS 307.162(1).[3] Late filings are permitted under certain circumstances until April 1 of the tax year claimed. ORS 307.162(2). A new exemption claim is not required each year if there are no changes in the ownership, lease, use, or possession of the property. *See* ORS 307.162(1)(b)(B), ORS 307.166(2)(b) (concerning leased property). Property "that is subject to taxation on July 1 shall remain taxable" for the tax year "notwithstanding any subsequent transfer of the property to an exempt ownership or use." ORS 311.410. Similarly, property "exempt from taxation on July

---

[3] For properties acquired "after March 1 and before July 1, the claim must be filed within 30 days from the date of acquisition of the property." ORS 307.162(1)(c). The application deadlines in ORS 307.162 are made applicable to leased property such as the subject property by ORS 307.166(3).

1 shall remain exempt for the ensuing tax year, notwithstanding any transfer within the tax year to a taxable ownership or use." *Id.* Thus, "the taxable status of property does not change after July 1." *Christian Life Fellowship, Inc. v. Dept. of Rev.*, 12 OTR 94, 96 (1991).

Putting that together, July 1 is relevant to determining the taxable status of property, such that changes in ownership or use after that date do not impact the property's status as taxable or exempt. *See, e.g., Skatechurch, Inc. v. Multnomah County Assessor*, TC-MD 230427N, 2024 WL 1090615 (Or Tax M Div, Mar 13, 2024) (organization not eligible for exemption for 2023-24 tax year because it did not acquire property until July 5, 2023). Here, Plaintiff's first lease of the subject property ran from October 2023 through August 2024, so Plaintiff had possession of the subject property on July 1, 2024. Plaintiff was, therefore, eligible to receive exemption.

Plaintiff's temporary closure from July through August 2024 does not render the subject property ineligible for exemption. "There is no statutory requirement that property that otherwise qualifies for exemption must be continuously used for the exempt purpose, so long as non-exempt *uses* do not become primary." *YU Contemporary Inc. v. Dept. of Rev.*, 22 OTR 349, 367 (2017) (finding property entitled to exemption even though art exhibitions "occupied 363 out of 807 days in a period of over two years). That coheres with Oregon Supreme Court case law allowing exemption where property is under construction for eventual exempt use. In *Willamette Univ. v. Tax Comm'n*, 245 Or 342, 422 P2d 260 (1966), the court allowed an exemption for buildings under construction, concluding that the use of preparing property "to carry out the purposes of the exempt charity" qualified. In a later opinion, the court declined to extend *Willamette University*, to vacant land where no construction had begun. *Emanuel Lutheran Charity Bd. v. Dept. of Rev.*, 263 Or 287, 502 P2d 251 (1972). The subject property is eligible for exemption for the 2024-25 tax year because Plaintiff had possession of the subject

property by July 1, 2024, and was using the subject property, notwithstanding a brief closure.

With respect to the second timing issue – whether evidence that predates the start of the 2024-25 tax year may be considered – the court finds no limitation requiring consideration only of activities occurring during the 2024-25 tax year.[4] The April 1 deadline for timely exemption applications in ORS 307.162 is relevant context. To meet that deadline, taxpayer's application will likely rely on evidence predating the start of the tax year on July 1. Presumably, a county must also consider such evidence when reviewing the application. Moreover, this court frequently considers evidence predating the tax year at issue to determine if an organization qualifies as a charitable institution. *See, e.g., Serenity Lane*, 21 OTR 232, 239 (2013) (considering evidence from 2009 through 2011 to determine 2010-11 exemption); *Dept. of Rev. v. New Friends of Beaverton City Library*, 23 OTR 512, 513-15 (2019) (considering evidence from 2015 and 2016 to determine 2016-17 exemption).

Having concluded that the subject property was eligible for exemption for the 2024-25 tax year and that the court may consider evidence preceding the 2024-25 tax year, the court now turns to the primary issue of whether Plaintiff engaged in sufficient gift or giving.

B.      *Requirements to be Charitable Institution, Gift or Giving*

To qualify for exemption under ORS 307.145(1), Plaintiff must be an "incorporated eleemosynary institution" and must use the subject property "exclusively for or in immediate connection with educational purposes." The term "eleemosynary institution" is not defined in the statute, but this court has determined that it is synonymous with "charitable institution" in

---

[4] In *YU Contemporary*, the court asked the parties to address "the question of the time perspective that should be used in analyzing the issue in the case" and accepted the parties' view that "[t]he issue of exemption should be based on the assertions in an application for exemption, that is, on a 'looking forward' basis from the beginning of the tax year." 22 OTR at 363. Yet, the court considered evidence spanning 2013 through 2015 to determine whether to allow an exemption for the 2014-15 tax year. *See id.* at 350-361.

ORS 307.130 and subject to the same standard. *International Leadership Acad. v. Clackamas County Assessor*, TC-MD 180143N, 2018 WL 6437706 at *4-5 (Or Tax M Div, Dec 7, 2018).

The Oregon Supreme Court has articulated a three-part test to determine whether an organization qualifies as a charitable institution: "(1) an organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving." *SW Oregon*, 312 Or at 89. The dispute here concerns the third element, gift or giving. The gift or giving analysis focuses on the recipient's perspective. *Serenity Lane*, 21 OTR at 242-43.

Defendant maintains that Plaintiff's two forms of financial aid, which to date have only assisted one student, are insufficient to satisfy the gift or giving requirement. (Def's Mot Summ J at 7.) Defendant argues both that the financial aid does not meet a cost-based threshold in terms of the amount given and that it fails to meet a threshold in terms of the number of students assisted. (*Id.*) Plaintiff contends that the financial assistance it provided in 2024 proportionally constituted 10 percent of its operating revenue in the months in which it was provided, and that "nearly" 10 percent of its students are on financial aid. (Ptf's Opp'n to Def's Mot Summ J at 7.) Plaintiff further argues that Defendant improperly implies the existence of an undefined threshold of awards that Plaintiff must give to qualify as "eleemosynary". (*Id.*)

This court has rejected a "quantitative approach" to gift or giving, instead focusing on a "qualitative approach" as "more in keeping with the cases of this court and of the Supreme Court on the subject of exemption for charitable institutions." *New Friends of Beaverton City Library*, 23 OTR at 519 n 8. Four non-exhaustive factors are "especially probative" in determining whether the operations of a fee-charging organization involve sufficient gift or giving. *Serenity Lane,* 21 OTR at 236. Those factors are:

(1) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;

(2) Whether patients or patrons receive the same treatment irrespective of their ability to pay;

(3) Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed; and

(4) Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent.

*Id.* at 236. The court considers each of those four factors, and then any additional factors.

1.    *Use of Plaintiff's receipts*

"[R]evenues received by an institution organized for a charitable purpose must be used in furtherance of the charitable purpose of the institution rather than, for instance, the enrichment of the private individuals that control the institution." *Hazelden Foundation v. Yamhill County Assessor*, 21 OTR 245, 252 (2013). The parties stipulated that Plaintiff uses its tuition income to operate its pre-school. Plaintiff's financial statements for the month of September 2024, confirm that its income was used to pay for operating expenses, leaving a balance of $1,201 at month end. This factor weighs in Plaintiff's favor.

2.    *Treatment of patrons based on ability to pay*

The second factor is whether students receive the same treatment and services regardless of their ability to pay. *Serenity Lane*, 21 OTR at 236. In *Serenity Lane*, the provider offered treatment options "for the indigent and for individuals on the Oregon Health Plan, but [did] not typically admit such individuals to inpatient residential treatment." *Id.* at 237. Thus, it did not provide the same services regardless of ability to pay. *Id.* at 238. In *Hazelden*, patients received the same treatment once admitted to the facility. 21 OTR at 253. But the court placed little weight on that factor, observing "equal treatment of patients after they have been admitted is a hollow sort of charity if the ability of a patient to pay for treatment instead simply acts as a bar to

admission in the first place." *Id.*[5]; *see also Haney v. Marion County Assessor*, TC-MD 230349N, 2024 WL 4314149 at *4 (Or Tax M Div, Sept 24, 2024) (second factor undercut because student must have paid over $3,000 per year for classes to be eligible for a scholarship).

Here, no evidence suggests that Plaintiff provided different or lesser services to a student receiving financial aid. However, all students must pay $1,200 to apply for Plaintiff's services, somewhat undermining that equal treatment. This factor weighs slightly in Plaintiff's favor.

      3.      *Whether the doors are open to rich and poor alike and without discrimination*

The third factor asks whether Plaintiff's services are open to rich and poor alike and without discrimination to race, color, or creed. *Serenity Lane*, 21 OTR at 236. Defendant does not allege that Plaintiff engaged in discrimination, so the question is whether its services are available to both rich and poor. "[F]ailure by taxpayer to show that its doors are indeed 'open to rich and poor alike' would severely undermine the case for the presence of 'gift or giving.'" *Hazelden*, 21 OTR at 253. The court considers each of Plaintiff's two forms of financial aid: first, acceptance of ERDC payments, and second, in-house tuition assistance.

      a.      Acceptance of ERDC payments

In the context of addiction treatment, the court considered evidence of an organization's "positive desire to make its services widely available to the poor, as well as to the relatively affluent patients that make up the bulk of" its clientele. *Serenity Lane*, 21 OTR at 238. The organization's willingness to accept patients on Medicaid or the Oregon Health Plan and its treatment options for indigent patients was compelling evidence that the taxpayer's services were "widely available to the poor." *Id.* at 238. By contrast, an organization's refusal to accept

---

[5] An average patient paid $27,000 for a 28-day residential treatment, and typically capped financial aid at 60 percent of that cost, subject to some exceptions. *Id.* at 247, 257.

payments from Medicare or Medicaid was evidence that it practically excluded indigent patients from its "pool of potential patients." *Hazelden*, 21 OTR at 257.

Here, Plaintiff's policies allow students to utilize payments from Oregon's ERDC program. To qualify for assistance through the ERDC program, families must meet certain eligibility criteria outlined by statute and rule, including household income. ORS 329A.500(4), (5); OAR 414-175-0020. Qualifying families receiving benefits through the Temporary Assistance for Needy Families (TANF) program are given priority. ORS 329A.500(5)(b)(B). Plaintiff's policy to accept ERDC payments indicates its intention to make its services available to poor and indigent students as well as affluent students. Plaintiff had not enrolled any students who qualified for ERDC, limiting the impact of this policy for the 2024-25 tax year.[6]

### b. In-house tuition assistance

Plaintiff offered a scholarship program for families making less than 80 percent of the median area income. Monthly tuition assistance equates to the difference between regular tuition and eight percent of the family's gross annual income divided by nine months. To access tuition assistance, families must first pay a $200 application fee and a $1,000 refundable deposit. Thus, to be eligible for a scholarship, families must pay $1,200 in fees along with eight percent of their adjusted gross annual income. To date, one student has received assistance from this program and pays $611 per month for $1,850 in tuition value, a reduction of $1,239 per month.

As this court has explained, "[t]he existence of a need-based sliding scale and its practical effect in allowing the poor and indigent access services is important to the analysis, more so than the total amount of aid provided by the organization." *Int'l Leadership Acad.*, 2018 WL

---

[6] In *Hazelden*, the "taxpayer accepted roughly one patient per quarter at no charge on a referral from the Yamhill County HHS." 21 OTR at 224. While demonstrating "considerable generosity on the part of taxpayer, the problem remains that they are very few in number." *Id.* at 256.

6437706 at *6 (noting that, in *Serenity Lane*, the court granted exemption where "taxpayer's total charitable giving amounted to 2.3 percent of its revenues"). "If, as a practical matter, the poor and the indigent are still generally unable to access the services of an institution despite the existence of a need-based sliding scale of fees, then the institution may well be admirable, but it is not charitable." *Serenity Lane*, 21 OTR at 239. Thus, the contours of the aid program matter.

In *Hazelden*, taxpayer's aid program capped financial aid at 60 percent of its fees – which averaged $27,000 per month – and communicated that cap to applicants on the worksheet. 21 OTR at 247-78, 245-55. Even though the taxpayer granted some exceptions to the cap, the court found the cap "suggest[ed] some measure of disregard for the needs or circumstances of medium and low-income individuals." *Id.* at 256-57. The court observed that "40 percent of $28,000 is a large sum * * *." *Id.* at 257. In the context of recreational youth classes, this court found that a program requiring families to pay a minimum of $3,120 per year to be eligible for a scholarship and then $2,720 per year upon receipt of a scholarship was too burdensome for poor or indigent families. *Haney*, 2024 WL 4314149 at *4. In another case involving youth sports, this court found that a scholarship program capped at $500, leaving families to pay fees ranging from $800 to $1,300 did not provide sufficient access to poor and indigent families to say the doors were open to rich and poor alike. *Columbia Empire Region Volleyball Ass'n v. Multnomah County Assessor*, TC-MD 150421N, 2016 WL 4547047 at *8 (Or Tax Mag Div, Aug 30, 2016).

Plaintiff's in-house tuition program presents a closer call. The amount of assistance relative to tuition is significant, particularly as compared to Plaintiff's total resources. *See Rigas Maja, Inc. v. Dept. of Rev.*, 12 OTR 471, 475 (1993) (finding requisite giving present when an organization gave "to the extent of its resources"). Yet, families must pay an up-front cost of $1,200 to access the tuition assistance. That is also a significant sum, and the court received no

evidence of a waiver or similar provision for a family unable to pay that amount. Plaintiff's in-house tuition program weighs in its favor but is undercut by the cost to access it.

Courts have also considered the overall number of patrons who receive assistance. For instance, providing services to those in need at below-market rates might satisfy the gift or giving requirement. *Serenity Lane*, 21 OTR at 240; *see also Care for Kids, Inc. v. Yamhill County Assessor*, TC-MD 991297D, 2000 WL 36750823 (Or Tax M Div, July 10, 2000) (below market rates, coupled with free preschool for children enrolled in childcare and acceptance of social service payments equated to sufficient gift or giving). This court has found that providing substantial tuition assistance to a meaningful portion of enrolled students was sufficient to satisfy the charitable giving requirement. *Int'l Leadership Acad.*, WL 6437706 at *7 (school provided significant financial aid to three of the twelve students in its daycare program and to a total of 28 students across the entire institution, meeting this factor).

Here, Plaintiff stipulated that its tuition was at or above market rates. Only one of Plaintiff's thirteen enrolled students, less than 8 percent, received financial assistance as of November 2024. That evidence is insufficient to support a finding that Plaintiff provided broad financial assistance or reduced rates as of the 2024-25 tax year.

c. Conclusion whether doors are open to rich and poor alike

The court finds that Plaintiff's willingness to accept ERDC payments, alongside the significance of its own tuition assistance program, weighs in Plaintiff's favor and signals that Plaintiff intended to make its services broadly available to rich and poor alike. However, this factor is undercut by the up-front payment requirements to access Plaintiff's tuition assistance program, and the limited number of students (one) receiving aid as of the 2024-25 tax year.

///

4.      *Sliding scale, charges to patrons*

The fourth factor asks whether charges are made to all users and, if so, whether lesser charges are made to the poor, or whether the indigent are charged at all. *Serenity Lane*, 21 OTR at 236. In a case involving an addiction treatment center's need-based "patient aid" program, this court found that the fourth gift or giving factor was not satisfied when the taxpayer used eligibility criteria that resulted in the "substantial exclusion of the poor and indigent from [services]." *Hazelden*, 21 OTR at 254. Here, as in *Hazelden*, the third and fourth factors are closely related because Plaintiff charges at or above market rates for its services, offering a reduction only through financial aid. *See id.* at 253-54.

The court questions whether an indigent family could realistically access Plaintiff's services even under its tuition assistance program. While the program is designed to support low-income families, defined as those earning less than 80 percent of the area median income, it still requires families to contribute 8 percent of their annual gross income toward tuition in addition to the $1,200 in up-front fees and deposits. Plaintiff has presented no evidence of any fee waivers, sliding-scale adjustments, or supplemental tuition assistance that might be available to indigent families unable to meet the 8 percent income contribution requirement. Although Plaintiff's requirement may reflect a good-faith attempt at proportional cost-sharing, the burden on the poorest families could effectively exclude them from participation.[7] This concern is reinforced by the fact that only one student has qualified for assistance under the program to date, suggesting limited practical accessibility for indigent applicants. This factor weighs somewhat against Plaintiff, as the program has served only one eligible student to date, and the

---

[7] There may be valid reasons for an organization to insist on *some* amount of payment in every case. For instance, in *Serenity Lane*, the court accepted taxpayer's explanation of "a legitimate therapeutic reason" to insist patients pay something for treatment as "an investment in their recovery from addiction." 21 OTR at 238.

required family contribution may still be prohibitively burdensome for an indigent household.

     5.    *Additional gift or giving factors*

In addition to the forms of giving discussed above, Plaintiff alleges one additional form of giving: the 12 weekend enrichment classes it offered between February and April 2024. Defendant argues that Plaintiff's weekend enrichment classes do not count toward the statutory requirement of gift or giving because the classes were geared toward children outside Plaintiff's core services, those being preschool-age children. (Def's Mot Summ J at 8.) Plaintiff contends that the classes included preschool-age children and advanced Italian immersion education, which is "at the core of [its] services." (Ptf's Opp'n to Def's Mot Summ J at 8.)

The question becomes, what is Plaintiff's charitable purpose? To qualify for a charitable exemption, "the organization must be performing in a manner that furthers its charitable object." *SW Oregon*, 312 Or at 89. The claimed use or activity must "substantially contribute[] to the furtherance of the charity's goals." *Young Men's Christian Ass'n v. Dept. of Rev.*, 268 Or 633, 522 P2d 464 (1974).[8] An internship program for aspiring addiction counselors counted "at the margins" towards taxpayer's gift or giving, where taxpayer's primary activity was operating addiction treatment programs. *Serenity Lane*, 21 OTR at 230, 242-43.

Here, Plaintiff's mission statement specified its commitment to "creating a community of early learners with a strong foundation in American and Italian language and culture." (Joint Ex 2 at 4.) Plaintiff's weekend enrichment classes focused on cooking, art, music, and magic from an Italian immersion perspective, remaining consistent with the goals in Plaintiff's mission statement. Although these classes differ from Plaintiff's preschool operations, they remain

---

[8] In *YMCA*, the court found that a cafeteria "implemented [the YMCA's charitable] objectives in a substantial way" because it served reasonably priced meals to YMCA residents, recreational users, and volunteers, and provided job training to individuals with disabilities. *Id.* at 635-36.

connected to Plaintiff's charitable purpose. Despite some classes recommended for older children, the flyer stated "[c]lasses are open to everyone." The court concludes that the "weekend enrichment classes" contributed to Plaintiff's charitable purpose.

The next question is whether Plaintiff's weekend enrichment activities counted as part of its gift or giving. It is undisputed that the classes were offered for free, constituting a gift from the perspective of the recipients (class participants). Furthermore, classes were staffed and organized by volunteers supplied by Plaintiff. *See New Friends of the Beaverton City Library*, 23 OTR at 522 (use of volunteers "is some evidence of 'gift or giving,' although not conclusive by itself"). Based on those facts, the court concludes that the classes contributed, at the margins, to Plaintiff's gift or giving.

6.    *Conclusion regarding Plaintiff's "gift or giving"*

Upon review, the court finds that the first two traditional gift or giving factors weigh in favor of Plaintiff, the third is mixed, and the fourth weighs somewhat against Plaintiff. An additional factor – the weekend enrichment classes – weighs in favor of Plaintiff. Ultimately, the court finds insufficient evidence for the 2024-25 tax year that Plaintiff's services are accessible to poor and indigent families. To date, only one family had received a scholarship, and none had used ERDC funds. Plaintiff's scholarships are designed to assist with tuition, but not to cover the full cost of fees and tuition, likely making Plaintiff's services prohibitive to indigent families. The court acknowledges that Plaintiff's preschool was relatively new as of the 2024-25 tax year and evidence from additional years of operations may change the outcome in a future tax year. For the 2024-25 tax year, the court is not convinced that Plaintiff's activities demonstrate the degree of gift or giving necessary to qualify as a charitable institution.

/ / /

### III.  CONCLUSION

Upon careful consideration, the court finds that the subject property was eligible for exemption under ORS 307.145 for the 2024-25 tax year.  However, Plaintiff's operations did not involve sufficient gift or giving to qualify the subject property for exemption under ORS 307.145 for the 2024-25 tax year.  Plaintiff's appeal must be denied.  Now, therefore,

IT IS THE DECISION OF THE COURT that Defendant's motion for summary judgment is granted.

IT IS FURTHER DECIDED that Plaintiff's appeal of Account R200722 for the 2024-25 tax year is denied.

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This Decision was signed by Presiding Magistrate Allison R. Boomer and entered on August 1, 2025.*