IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| INTERNATIONAL LEADERSHIP ACADEMY, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 180143N |
| | ) | |
| v. | ) | |
| | ) | |
| CLACKAMAS COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiff appeals Defendant's denial of property tax exemption for property identified as

Account 01372589 (subject property) for the 2018-19 tax year. A trial was held in the Oregon

Tax Courtroom on August 6, 2018, in Salem. Massene Mboup (Mboup), Plaintiff's director,

appeared and testified on behalf of Plaintiff. Todd Cooper, appraisal supervisor, appeared on

behalf of Defendant. Amanda Olsen (Amanda) and Meka Olsen (Meka), assessment and

taxation specialists, each testified on behalf of Defendant.[2] Plaintiff's Exhibits 1 to 3 and

Defendant's Exhibits A to J were received without objection.

## I. STATEMENT OF FACTS

A.    *Plaintiff Organization*

Plaintiff is exempt from income taxation as a public charity under Internal Revenue Code

(IRC) section 501(c)(3). (Ptf's Ex 1 at 1.) Plaintiff is also a registered Oregon charity as a

"private school," with a purpose of providing "preschool and K-8 grade full curriculum

education." (*Id.* at 3.) Under its bylaws, Plaintiff's mission is to provide "a scholarly,

---

[1] This Final Decision incorporates the court's Decision, entered November 6, 2018, with the addition of the court's analysis regarding costs and disbursements in Section III.

[2] Ordinarily the court refers to individuals by their last names. However, two witnesses share the same last name, Olsen, so the court will use their first names.

innovative, multilingual and multicultural education to help each student maximize his or her lifelong potential and meet challenges with confidence." (Def's Ex D at 1.) Plaintiff's bylaws include a non-discrimination policy. (*Id.* at 2; *see also* Def's Ex G at 23 (notice of nondiscrimination policy as to students).)

Mboup testified that Plaintiff operates a French immersion school in Lake Oswego serving children from preschool through 5th grade. (*See* Def's Ex F at 3.) He testified that Plaintiff also operates ILA Crèche, a daycare facility that serves children from two months through two years old. (*See* Ptf's Ex 2 at 5.) Plaintiff's brochure states that ILA Crèche offers an "educational program to prepare your child (ages 10 weeks to 2 years) for preschool."[3] (Def's Ex F at 2.) ILA Crèche, operated at the subject property, is licensed by the State of Oregon Office of Child Care to provide care from 7:00 a.m. to 6:00 p.m. for as many as 16 children. (*See* Ptf's Ex 2 at 5; *see also* Def's Ex G at 16.)

Mboup testified that Plaintiff provides a high-quality education to its students, who are receiving top test scores in English. He testified concerning the importance of early childhood education, noting that school in France begins at age 3. Mboup testified that the daycare is a feeder for the school, with more than 90 percent of children continuing to the school. He testified that he does not see a distinction between the school and the daycare because of the importance of early childhood education. Mboup testified that Plaintiff has developed a curriculum around French immersion that complies with Early Learning Division guidance; the curriculum includes songs, puppet shows, nursery rhymes, art, "discovery of fruit and vegetables," play, emotional awareness, and more. (*See* Def's Ex I at 3-4.) He testified that the

---

[3] Elsewhere, Plaintiff's brochure states that ILA Crèche is for "toddlers through 3-year olds." (Def's Ex F at 3.)

four daycare teachers speak French to children starting at six months, including stories and songs in French. (*See id.*) Meka testified that, when she visited the daycare, one of the teachers did not speak French. Mboup disagreed with Meka's testimony.

B.     *Subject Property*

The subject property is a 2,520-square foot property located in Lake Oswego. (Def's Ex B at 4.) Plaintiff signed a triple net lease of the subject property on July 31, 2017. (*Id.* at 1, 8.) The lease states that the first floor of the subject property "shall be used as a daycare and for no other purpose." (*Id.* at 4.) It states that the second floor "shall be used as a dwelling unit and for no other purpose." (*Id.*) Mboup testified that the subject property is a two-story, four-bedroom house, of which two bedrooms are occupied by him and his family. He testified that the third bedroom is used as an office and the fourth is used as a teacher lounge for the daycare. Mboup testified that the remainder of the house is used for the daycare, including the garage where supplies are stored and the yard where toys and play structures are located. (*See* Def's Ex J.)

An email from Derek Malsam (Malsam), Plaintiff's treasurer, explained that Plaintiff moved the daycare away from the school after it outgrew the school campus. (Def's Ex I at 2.)

> "When ILA began in 2011, there were 28 students and by 2016 there were 90. Because of capacity a decision was made to have a secondary campus for a part of the school population. When ILA secured a lease on the house all students under 2 would [move] to [the subject property] from the main campus. This segment of the school is called Creche[.]"

(*Id.*) Mboup testified that the subject property is located one mile from the school. Plaintiff could not find any space for the daycare in a commercial zone, so it is in a residential zone. Pursuant to licensing requirements for a family daycare center in a residential zone, the operator must live on the premises. Mboup testified that he and his family are restricted in their use of the house; they cannot entertain guests or consume alcohol. He acknowledged that there is value to

receiving housing from Plaintiff, but he finds living at the subject property to be a burden due to the restrictions. Mboup testified that he receives a salary from Plaintiff separate from housing at the subject property. He has 32 years of experience in education and is a PhD candidate.

C.      *Plaintiff's Charitable Giving*

In its report to the Charitable Activities Section of the Oregon Department of Justice for the fiscal year July 1, 2016, through June 30, 2017, Plaintiff reported total revenue of $963,975. (Ptf's Ex 1 at 5-6.) Plaintiff reportedly spent $915,044 on "program expenses," which accounted for 85 percent of total operating expenses. (*Id.* at 6.) Plaintiff's tuition for the 2018-2019 school year ranged from $10,700 to $11,450 for full-day preschool through 5th grade and $8,500 for half-day preschool and junior kindergarten. (Def's Ex G at 15.) Depending on the age of the child, monthly tuition for daycare ranged from $1,386 to $1,633 for five days per week; $1,089 to $1,182 for three days per week; and $836 to $902 for two days per week. (*Id.* at 15-16.) There were 12 students enrolled in the daycare for the 2018-2019 school year. (Def's Ex I at 1.) Full tuition before financial aid for those students was $116,621.09. (*Id.*)

Plaintiff provides tuition assistance to low-income families that cannot afford to pay the full amount of tuition. (Def's Ex F at 1.) Plaintiff provided a copy of its 2018-2019 financial aid application, a multi-page form created by "TADS." (Def's Ex G at 8-12.) The form seeks information about income, assets, and debts, as well as special circumstances. (*Id.*) Mboup wrote that students receive the same services regardless of their ability to pay. (Def's Ex F at 1.) Plaintiff "does not account for donated funds and items separately." (*Id.*)

Plaintiff provided various documents concerning its tuition assistance. Plaintiff provided letters from 11 families that received assistance in the 2017-2018 and 2018-2019 school years. (Ptf's Ex 3.) Based on the letters, Plaintiff's 2017-2018 aid ranged from $1,752 to $29,970, with

a total of $112,682.75.  (*See id.*)  Plaintiff's 2018-2019 aid ranged from $920 to $30,442, with a

total of $106,899.  (*See id.*)  One family reported two children attending Plaintiff's programs, but

additional records provided by Malsam indicated that eight families receiving assistance had two

children enrolled in Plaintiff's programs.  (*See* Ptf's Ex 3 at 3; Def's Ex G at 3, 6.)  Another

spreadsheet provided by Malsam showed total "tuition assistance" of $170,864.50 to 15 students

in 2017-2018.  (Def's Ex I at 2, 5.)  Mboup wrote on March 8, 2018, that Plaintiff gave a total of

$177,804 in scholarships "this year" to a total of 28 students.  (Def's Ex G at 1.)  He attached a

listing of the families receiving tuition assistance, presumably covering two school years.[4]  (*Id.* at

2-7.)  Mboup testified that those numbers reflect the school and daycare.  He testified that three

of the 12 children, 25 percent, enrolled in the daycare received assistance totaling approximately

$30,000.  (*See also* Def's Ex I at 1 (letter from Malsam stating that three children in daycare

received financial aid totaling $27,870).)  Mboup testified that Plaintiff does not generally

segregate the school and daycare funds because Plaintiff is a single organization.[5]

D.      *Plaintiff's Application for Property Tax Exemption and Defendant's Denial*

In January 2018, Plaintiff filed an application for property tax exemption for the subject

property.  (Ptf's Ex 2 at 2.)  Plaintiff described its "purpose" as "family day care center" and

stated it would use the subject property for "classrooms."  (*Id.*)  Defendant denied the application

in a letter dated February 22, 2018, because "it [did] not appear that the property [was] being

---

[4] One set of lists referenced tax returns for 2016 and 2017, whereas the second set of lists referenced tax returns for 2015 and 2016.  (*See* Def's Ex G at 2-7.)  The lists include a column captioned "Has Calculated Need" with either a "Yes" or "No" next to each student.  (*See id.* at 3, 6.)  For the 2016-2017 list, six children received a "Yes" notation and five received a "No" notation.  (*Id.* at 3.)  For the 2015-2016 list, 11 children received a "Yes" notation and six received a "No" notation.  (*Id.* at 6.)  It may be that children receive tuition assistance for reasons other than "need."  However, no explanation of the notations was provided at trial.

[5] The parties dispute when Defendant requested financial information specific to the daycare.  (*See* Def's Ex E (letter requesting additional information about "your organization," but also referencing the subject property).) The parties also dispute whether Plaintiff's charitable giving should be viewed as a whole or at each property. Amanda testified that charity is viewed on a site by site basis, not based on the overall organization.

exclusively used for charitable purposes." (*Id.* at 3.)

Amanda testified that she has 10 years of experience reviewing property tax exemption applications for Defendant, including three to five applications under ORS 307.145 each year. She testified that her experience is largely limited to reviewing applications for schools and academies, not daycare facilities; she may have reviewed an application for the YMCA. Amanda testified that she inspected the subject property and observed that only the first floor was used for day care; the second floor was used for other purposes, including bedrooms and an office. She testified that, in her view, the subject property is not entitled to exemption because Plaintiff does not engage in sufficient education or charity at the subject property.

Meka testified that she did not see evidence that Plaintiff engaged in charity, so she denied the exemption application on February 22, 2018. (Def's Ex H.) She testified that, after Plaintiff's Complaint was filed, she corresponded with Malsam by email and asked for copies of the curriculum and financial aid given. (*See* Def's Ex I.) Meka testified that she found the information provided to be unsatisfactory because it was unclear, inconsistent, and unsupported by credible documentation. She testified that, based on her Department of Revenue training, Plaintiff's daycare curriculum did not qualify as "educational." Meka testified that, as of the trial date, she thought the subject property does not qualify for exemption because it is leased and ORS 307.145 references properties "owned or being purchased by" the organization.

## II. ANALYSIS

The issue before the court is whether the subject property qualifies for property tax exemption under ORS 307.145 for the 2018-19 tax year.[6]

/ / /

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

ORS 307.145(1) exempts from property taxation "child care facilities, schools, academies and student housing accommodations, owned or being purchased by incorporated eleemosynary institutions or by incorporated religious organizations, used exclusively by such institutions or organizations for or in immediate connection with educational purposes[.]" The statute defines "child care facility" as "a child care center certified by the Office of Child Care under ORS 329A.280 to provide educational child care." ORS 307.145(3)(a). The applicable administrative rule defines "schools" and "academies" for purposes of ORS 307.145, including specific components of the instructional program. Oregon Administrative Rule (OAR) 150-307-0160(1). It states that "a pre-school or pre-kindergarten must qualify as a 'child care facility' as defined in ORS 307.145(3)(a)" in order to receive exemption. OAR 150-307-0160(3).

"Taxation is the rule and exemption from taxation is the exception." *Dove Lewis Mem. Emer. Vet. Clinic, Inc. v. Dept. of Rev.*, 301 Or 423, 426, 723 P2d 320 (1986) (citation omitted). When construing tax exemption statutes, Oregon follows a rule of "strict but reasonable construction." *Habitat for Humanity of the Mid-Willamette Valley v. Dept. of Rev.*, 360 Or 257, 261 n1, 381 P3d 809 (2016) (citations omitted). "In other words, the court starts by attempting to ascertain legislative intent because 'the intention of the legislature must be the primary objective sought.' But if the court cannot discern the legislative intent, then the court resolves any ambiguity by applying appropriate canons of statutory construction." *Id.* (citations omitted). One such canon in tax exemption cases is " 'that statutes providing exemption from taxation are to be strictly construed' against the taxpayer and in favor of the state." *Id.* (citation omitted). Plaintiff bears the ultimate burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

A.      *Exemption for Leased Property*

Defendant raised a new issue at trial: whether the subject property may receive exemption as a leased, rather than owned, property. Defendant reasoned that ORS 307.145(1) refers to properties "owned or being purchased by" various organizations, so leased properties could not qualify for exemption.[7] Notwithstanding that language, the legislature has enacted statutes permitting exemption of leased property used by organizations that would otherwise be entitled to property tax exemption. *See* ORS 307.112 (concerning property owned by a taxable owner and leased to an exempt organization) and ORS 307.166 (concerning property owned by an exempt organization and leased to another exempt organization).

Here, Plaintiff leased the subject property from a taxable owner, so ORS 307.112 rather than ORS 307.166 applies. ORS 307.112(1) states that "[r]eal or personal property of a taxable owner held under lease, sublease or lease-purchase agreement by an institution, organization or public body * * * granted exemption or the right to claim exemption for any of its property under * * * ORS 307.145 * * * is exempt from taxation if" the additional requirements set forth in the statute are satisfied. Thus, ORS 307.112, by its terms, applies to ORS 307.145. To give effect to the plain language of ORS 307.112, an organization entitled to exemption under ORS 307.145 must be permitted an exemption on its qualifying leased property. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) ("at the first level of analysis, the court considers the context of the statutory provision at issue, which includes other provisions of the same statute and other related statutes") *rev'd on other grounds*.

/ / /

---

[7] Identical language appears in other exemption statutes concerning the property of charitable and religious organizations. *See, e.g.,* ORS 307.130(2), 307.140.

Numerous decisions by this court confirm that leased property may qualify for exemption under ORS 307.145. *See, e.g., The International School v. Dept. of Rev.*, 13 OTR 220 (1995) (concerning an exemption under ORS 307.145 for leased property); *McQuillan v. Lane County Assessor*, TC-MD 050053C, WL 1089753 (May 4, 2005) (plaintiff-lessee applied for the ORS 307.145 exemption under ORS 307.112); *Springwater Environmental Sciences School v. Clackamas County Assessor*, TC-MD 100196D, WL 579083 at (Feb 17, 2011) (application was filed pursuant to ORS 307.166); *Bethel Family Tech & Resource Center v. Lane County Assessor*, TC-MD 100061C, WL 3463306 at *2 (Sept 3, 2010) (stating that ORS 307.112 governs the application process where lessee is entitled to exemption under ORS 307.145 and the property owner is a taxable entity); and *1200 Bldg Ltd the Northwest Academy v. Multnomah County Assessor*, TC-MD 110818C, WL 850781 (Mar 12, 2012) ("ORS 307.112 extends the exemption available under ORS 307.130 and ORS 307.145 * * * to organizations and institutions that are leasing or subleasing property from a taxable owner * * *").

The subject property may qualify for exemption under ORS 307.145 and ORS 307.112, notwithstanding the fact that Plaintiff leases rather than owns it. The court turns to whether the subject property qualifies for exemption under ORS 307.145.

B.      *Eleemosynary Institution*

Defendant maintains that Plaintiff did not engage in sufficient charity to qualify for property tax exemption under ORS 307.145. Neither that statute nor the administrative rule contain any specific requirement concerning charitable activities. *Compare with* OAR 150-307-120(4) (describing the requirements to qualify as a "charitable institution" under ORS 307.130). The court understands Defendant's position to be that the standard to qualify as an eleemosynary institution under ORS 307.145 is the same as the standard to qualify as a charitable institution

under ORS 307.130. The court uses a three-part test to determine whether an organization qualifies as a "charitable institution" under ORS 307.130: "(1) the organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving." *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 89, 817 P2d 1292 (1991). The question becomes whether the legislature intended that the term "eleemosynary institution" under ORS 307.145 be synonymous with "charitable institution" under ORS 307.130, notwithstanding the use of different terms.

The term "eleemosynary institution" is not defined in ORS 307.145. The dictionary defines "eleemosynary" as "**1 :** of or relating to charity **:** CHARITABLE, PHILANTHROPIC * * * **2 a :** nonprofit and receiving all or a great part of sustaining funds from donations or gifts[.]" *Webster's Third New Int'l Dictionary* 733 (unabridged ed 2002). The statutory language — "if not otherwise exempt by law" — suggests that property of eleemosynary institutions may be exempt under other provisions of Oregon law, such as ORS 307.130.

A 1944 Oregon Supreme Court case used "eleemosynary" and "non-profit organization" synonymously, and included "institutions of learning" within that category of organization. *See Behnke-Walker v. Multnomah County*, 173 Or 510, 513-514, 146 P2d 614 (1944). Subsequently, Oregon courts have used the terms "eleemosynary" and "charitable" interchangeably, and referenced a "gift or giving" requirement implicit in the concept. *See Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 360 P2d 293 (1961) (using "eleemosynary" and "charitable" interchangeably); *First EUB Church v. Comm'n*, 1 OTR 249, 258 (1963) (describing a "public charity" as having an "eleemosynary character"); *Salem Non-Profit Housing, Inc. v. Dept. of Rev.*, 9 OTR 265, 270 (1982) (holding that "[t]he plaintiff is not an eleemosynary institution. No

gift is involved; ergo, there is no 'charity' as is implicitly required by the Oregon statute."); *State ex rel NW Medical Lab., Inc. v. Wilcox*, 10 OTR 181, 185 (1985) (describing the purpose of the *Oregon Methodist Homes* test as "to winnow out those organizations which fail to implement an eleemosynary philosophy. Charity involves giving. If there is no gift involved, there is no charity.")

An "eleemosynary institution" under ORS 307.145 is a "charitable institution" under ORS 307.130. Accordingly, it is appropriate to consider the *SW Oregon* three-part test to determine whether Plaintiff is an "eleemosynary institution." It does not appear that the parties dispute whether Plaintiff had a charitable object or performed in furtherance of its charitable object. Furthermore, this court has determined that education is a charitable purpose. *See, e.g., Oregon Center for Public Policy v. Multnomah County Assessor*, TC-MD 160308G, WL 4177026 at *3-4 (Sept 19, 2017). Rather, the dispute centers on whether Plaintiff engaged in sufficient "gift or giving" to qualify as charitable.

1.      *Scope of the "gift or giving" test – organization or site*

The court must first address an issue raised by Defendant of whether the "gift or giving" test is applied on a site-by-site basis or to the organization as a whole.

In *Mercy Medical Center, Inc. v. Dept. of Rev.*, 12 OTR 305, 307 (1992), this court stated that the three *SW Oregon* tests are "applied to an organization overall and not to any specific part or operation. For example, whether a hospital involves a gift or giving is determined on an overall basis, not by whether the cafeteria, pharmacy or laboratory involves giving." Because the defendant had conceded that the plaintiff-hospital was a charitable organization, the court found the "defendant's arguments with regard to the absence of a gift or giving in the operation of the gift shop [to be] irrelevant." *Id.* Instead, the court considered whether the gift shop was

"exclusively used" by the hospital to achieve its charitable goals and whether it " 'substantially contribute[d]' to furthering those goals." *Id.* at 308. This court extended the reasoning of *Mercy Medical* to an addiction treatment provider that operated multiple outpatient facilities in Oregon. *Serenity Lane, Inc. v. Multnomah County Assessor*, TC-MD 111141N, WL 3890327 (Aug 8, 2014). Because the court had previously determined that the organization qualified as a "charitable institution" under ORS 307.130, the court declined to apply the "gift and giving" part of the *SW Oregon* test to each of Plaintiff's facilities. *Id.* at *4-5.

The *SW Oregon* three-part test — including the "gift or giving" requirement — is applied to the organization as a whole and not its separate parts or sites.

2.      *Plaintiff's gift or giving*

"The fact that an organization charges a fee for its services does not necessarily invalidate its claimed status as charitable., It is a factor to be considered in the context of the organization's manner of operation." OAR 150-307.0120(4)(d)(C). The court considers the following factors:

> "(i) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed;
>
> "(ii) Whether patients or patrons receive the same treatment irrespective of their ability to pay;
>
> "(iii) Whether the doors are open to rich and poor alike and without discrimination as to race, color or creed;
>
> "(iv) Whether charges are made to all and, if made, are lesser charges made to the poor or are any charges made to the indigent."

OAR 150-307.0120(4)(d)(C); *see also Serenity Lane, Inc. v. Lane County Assessor*, 21 OTR 229, 236 (2013) (discussing factors).

/ / /

/ / /

With respect to the first factor, Plaintiff's receipts are primarily used to fund its program expenses. No evidence was presented that Plaintiff's revenues inured to the benefit of any private individual, other than to the extent Plaintiff's employees receive payment for services.

With respect to the second factor, Plaintiff asserted that all students receive the same treatment regardless of ability to pay. The children attending Plaintiff's school and daycare are intermingled in the same classes and daycare programs. Plaintiff presented evidence of a single curriculum followed at the daycare. No evidence was presented that children receiving tuition assistance received different services than children paying full tuition.

The third factor contains two tests: (1) whether the doors are open to rich and poor alike; and (2) whether the doors are open without discrimination as to race, color, or creed. Plaintiff's bylaws contain a non-discrimination policy and Plaintiff notifies students and their families of that policy. On that evidence, the court is convinced that Plaintiff's doors are open without discrimination as to race, color or creed. Whether Plaintiff's doors are open to rich and poor alike requires a careful examination of its tuition and fee schedule, its financial aid policy, and its communication to students and their families about financial aid.

The existence of a need-based sliding scale and its practical effect in allowing the poor and indigent access services is important to the analysis, more so than the total amount of aid provided by the organization.[8] "If, as a practical matter, the poor and the indigent are still generally unable to access the services of an institution despite the existence of a need-based sliding scale of fees, then the institution may well be admirable, but it is not charitable." *Serenity Lane*, 21 OTR at 239. In *Hazelden Foundation v. Yamhill County Assessor*, 21 OTR 245, 246-

---

[8] In *Serenity Lane*, the taxpayer's total charitable giving amounted to 2.3 percent of its revenues. 21 OTR at 239. Additionally, the taxpayer provided detox services to patients on Medicaid and the Oregon Health Plan, provided services below market rates, and offered an internship program to train aspiring counselors. *Id.* at 238-43.

247 (2013), the taxpayer operated an addiction treatment facility with fees averaging $27,000 for a 28-day residential treatment. The taxpayer offered a "patient aid" financial assistance program, but the program worksheet communicated to applicants that the potential discount maxed out at 60 percent. *Id.* at 247-48, 254-55.[9] The court found that "[p]lacing an across-the-board (albeit porous) cap at 60 percent patient aid suggests some measure of disregard for the needs or circumstances of medium and low-income individuals." *Id.* at 256-257. The court ultimately concluded that the taxpayer failed to show that its doors were open to rich and poor alike and that the taxpayer engaged in insufficient "gift or giving" to qualify for exemption. *Id.* at 258.

Plaintiff's annual tuition ranged from $8,500 to $11,450 at the school and $10,032 to $19,596 at the daycare.[10] The court received no evidence of how Plaintiff's rates compared to market rates. The tuition assistance provided ranged from $1,752 to $29,970 in 2017-2018 and from $920 to $30,442 in 2018-2019. Amounts at the high end of the range exceed Plaintiff's tuition and, presumably, correlate to families with multiple children. Although Plaintiff's records concerning its tuition assistance program lack some clarity, the court is convinced that Plaintiff provides a significant amount of tuition assistance to families with children attending Plaintiff's programs. Plaintiff's financial aid application is designed to assess a family's ability to pay and does not communicate any limitations or caps on available assistance. The amounts of tuition assistance provided are sufficient to allow the poor to access Plaintiff's programs.

With respect to the fourth factor, Plaintiff has provided a range of tuition assistance with the high end of the range sufficient to cover its tuition. That range of tuition assistance reflects a

---

[9] In practice, the taxpayer granted larger discounts in "a few" circumstances. The court found that "the numbers of patients receiving either residential or extended care at a level of patient aid above [the 60 percent discount] are very small, relative to taxpayer's overall patient load for that year: 1 out of 274 patients in 2009; 6 out of 309 patients in 2010; and 5 out of 334 patients in 2011." *Hazelden*, 21 OTR at 254-255.

[10] Plaintiff's daycare fees are monthly. The court calculated annual rates assuming 12 months of daycare.

sliding scale tuition scale based on financial need. For the 2018-2019 school year, Plaintiff provided tuition assistance to 25 percent of children attending its daycare and 28 children total.

C.      *Educational Purpose*

To receive exemption under ORS 307.145, the property must be "used exclusively" by the qualifying institution "for or in immediate connection with educational purposes. "Child care facilities" are further subject to a certification requirement under ORS 329A.280. There is no dispute in this case that the subject property is appropriately certified by the Office of Child Care. Rather, the two issues are whether the subject property is used for educational purposes and, if so, whether the subject property is exclusively used for such purposes.

1.      *Educational purpose*

ORS 307.145 does not define "educational." The accompanying administrative rule provides a definition of "schools" and "academies" that references the type of curriculum required: "a comprehensive instructional program that is not limited to dance, drama, music, religious or athletic instruction, or other special art or technical skill." OAR 150-307-0160(1)(b). However, that rule only applies to institutions providing education to kindergarten through college or university. OAR 150-307-0160(1)(a). Pre-school and pre-kindergarten "must qualify as a 'child care facility' as defined in ORS 307.145(3)(a)." OAR 150-307-0160(3). As noted, the subject property satisfies the requirements of ORS 307.145(3)(a) because it is certified by the Office of Child Care.

Defendant takes the position that, to qualify as "educational," Plaintiff's day care must satisfy the curricular requirements applicable to "schools" and "academies." That reading is not supported by the statute or rule, which each distinguishes between "schools," "academies," and "child care facilities." The type of curriculum appropriate for children in pre-school or pre-

kindergarten is not the same as the type of curriculum appropriate for older children. Those differences do not mean that a curriculum designed for younger children is not "educational."

In *Christian Pre-School v. Dept. of Rev.*, 5 OTR 8, 12 (1972),[11] this court found that a pre-school provided "an educational learning experience through instruction and supervision by certified teachers." "Instruction of nursery and pre-primary age groups is now recognized by authorities and knowledgeable parents as all-important to the individual child's development. The aspects of Pre-School's curriculum which appeared to defendant as intended to amuse the children are recognized by the court as having a planned educational value." 5 OTR at 12. The children attending the pre-school ranged from two to six-years-old and were supervised by a certified kindergarten teacher. *Id.* at 9. The curriculum included "show and tell," music, nursery rhymes, arts and crafts, a "free play period," and a rest period. *Id.* at 10.

Plaintiff's day-care program is staffed primarily, if not entirely, by French speakers to provide the children with French language immersion. Mboup, who oversees the program, is highly educated and has significant experience in the field of education. Plaintiff provided an age-appropriate curriculum for its daycare program like the curriculum described in *Christian Pre-School*: each included nursery rhymes, story time, art, and play. The court is convinced that Plaintiff used the subject property for educational purposes.

2.      *Exclusive use*

ORS 307.145 does not define "exclusive use." However, the term "exclusive use" in the context of ORS 307.130 refers to the "primary" rather than the "incidental" use of the property. *Mult. School of Bible v. Mult. Co*, 218 Or 19, 29, 343 P2d 893 (1959) (citations omitted).

---

[11] The version of ORS 307.145 in effect at the time of the decision did not include "child care facilities." Accordingly, the court analyzed whether the pre-school qualified as a "school" under the statute. 5 OTR at 12.

Additionally, courts consider whether the property "is incidental to and reasonably necessary for the accomplishment and fulfillment of the generally recognized functions of such a charitable institution." *Id.* at 36-37. "If, then, the primary use of the property is reasonably necessary for the charitable functions of the taxpayer, an exemption under ORS 307.130 will be allowed." *German Apost. Christ. Church v. Dept. of Rev.*, 279 Or 637, 642, 569 P2d 596 (1977).

Here, Plaintiff's purpose is education. The court is satisfied that the first floor of the subject property and the outdoor play space was primarily used to achieve Plaintiff's educational purposes. The daycare program operated from 7:00 a.m. to 6:00 p.m., five days per week. Additionally, the lease restricted the first floor of the subject property to use as a day-care. The question is whether the second floor of the subject property was used primarily to achieve Plaintiff's educational purposes. The second floor was used as a dwelling by Mboup and his family, though the third bedroom was used as an office and the fourth bedroom was used as a teacher lounge for the daycare. The lease restricts the second floor to use as a dwelling.

This court has, in some cases, allowed an exemption for property used as a dwelling for school employees. In *Mult. School of Bible*, the court granted exemption to a residence used by the dining hall supervisor as well as the superintendent of buildings for the school along with his wife. 218 Or at 22, 37. The court determined that one "reasonably necessary" function of a college was "the continuance of the health, safety and comfort of its students" including "proper maintenance of its plant and without interruption or delay in the use of its institutional facilities." *Id.* at 37. In *Lewis & Clark College v. Comm'n*, 3 OTR 429 (1969), the court granted an exemption under ORS 307.130 to the college president's official residence. The court found that the residence was used for official college business 115 times from 1966 to 1968, including conferences on college administration; meetings for students, faculty, alumni, and community

members; fund raising events; and entertainment of visiting educators. *Id.* at 431-32.

However, the court denied exemption for a caretaker's cabin at a summer youth camp, finding it was not "reasonably necessary" to the operation of the camp. *Archdiocese of Portland v. Dept. of Rev.*, 14 OTR 264, 269 (1998). The court questioned whether the taxpayer had other options, such as an off-site caretaker residence near the camp. *Id.*

In the context of religious property tax exemptions, this court allows exemption to residences only where the official living in the residence is "required to live there by either church doctrine or practical necessity" and "the proximity of the residence to the house of worship must be necessary to further religious objectives." *Washington Co. Assessor II v. Jehovah's Witnesses.*, 18 OTR 409, 418-419 (2006). In *German Apost. Christ. Church*, the court found "insufficient evidence" to exempt those parts of the property used as a parsonage; there was no evidence of the specific duties requiring continuous presence of the administering elder. 279 Or at 644-645. In *Full Circle Family Church v. Benton County Assessor*, TC-MD 150080D, WL 5278928 (Sept 9, 2015), the court allowed an exemption for gardens used to provide free produce to the community, but denied exemption to the farmhouse occupied by two church members who tended the garden.

Here, the court finds that the second floor of the subject property was used primarily as a dwelling for Mboup and his family and incidentally for daycare related activities. Although two bedrooms were used for some daycare related activities (the office and teacher's lounge), the court did not receive sufficient evidence that those activities were the primary use of that space.

Mboup testified that he was required to live at the subject property as a condition of operating the daycare in a residential zone. Plaintiff located the daycare in a residential zone because it did not find suitable space in a commercial zone. There is no evidence that Plaintiff

required Mboup to live at the subject property to perform duties related to the school or daycare. Unlike the colleges and the youth camp discussed above, Plaintiff's daycare is not a residential program; *i.e.*, the children do not live at the subject property. It may be that, in certain cases, a school or childcare facility requires caretakers to live onsite to perform duties related to the educational mission or as a practical necessity due to the location of the property. The court did not receive sufficient evidence to reach that conclusion in this case. It is unclear why Plaintiff was unable to find any suitable properties in a commercial zone or, perhaps, to seek a permit to operate a stand-alone daycare center in the residential zone. The court concludes that 50 percent of the subject property was used for exempt purposes.

## III. COSTS AND DISBURSEMENTS

The Magistrate Division has discretionary authority under ORS 305.490(2) to award costs and disbursements to the prevailing party. *Wihtol I v. Dept. of Rev.,* 21 OTR 260, 267-68 (2013). Tax Court Rule – Magistrate Division (TCR–MD) 16 describes the procedure for a prevailing party to request costs and disbursements. As required under TCR–MD 16 C(1), Plaintiff filed a Statement for Costs and Disbursements on November 21, 2018, requesting that the court award it costs and disbursements totaling $7,270.09. Plaintiff's cost request consists of $265 for the court filing fee and $7,005.09 for "paid property taxes." Defendant did not file a response and neither party requested that the court schedule a hearing "to consider issues and evidence related to the request for costs and disbursements." TCR–MD 16 C(3).

In analyzing Plaintiff's request for costs, the court first must decide whether it is the prevailing party. A prevailing party is one who "receives a favorable judgment or arbitration award on a claim." ORS 20.077(2); *Wihtol II v. Multnomah County Assessor,* TC-MD 120762N, 2014 WL 274126 at *2 (Or Tax M Div Jan 24, 2014). A party prevails if they persuade the court

to either grant relief or reject an opponent's claim for relief. *Ellison v. Dept. of Rev.*, 362 Or 148, 166, 404 P2d 933 (2017). There is no question that Plaintiff is a prevailing party in this matter—Plaintiff obtained relief from the court.

The next question is what costs and disbursements are allowable. TCR-MD 16 A defines "costs and disbursements" as:

> "reasonable and necessary expenses incurred in the prosecution or defense of an action other than for legal services, and include the filing fee; the statutory fees for witnesses; the necessary expense of copying of any public record, book, or document used as evidence in the trial; and any other expense specifically allowed by agreement, by these rules, by TCR [Tax Court Rule] 68 A(2), or by other rule or statute."

Plaintiff's request for its filing fee is specifically provided for in the rules and is allowed. However, taxes paid are not recoverable as a cost and disbursement.[12] That request must be denied. The court awards $265 to Plaintiff, representing its allowable costs and disbursements.

### III. CONCLUSION

Upon careful consideration, the court concludes that Plaintiff is an eleemosynary institution under ORS 307.145. The court further concludes that 50 percent of the subject property qualifies for property tax exemption as a child are facility. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted in part. Fifty percent of property identified as Account 01372589 is allowed exemption under ORS 307.145.

/ / /

/ / /

/ / /

/ / /

---

[12] Generally, any applicable overpayment of taxes is refunded with interest by the county after the court issues its judgment.

IT IS FURTHER DECIDED that Plaintiff is awarded costs and disbursements in the

amount of $265 for the court filing fee.

Dated this ___ day of December 2018.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer and entered on December 7, 2018.*